*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

In re ALTANTAWI, Minors.

UNPUBLISHED
June 27, 2019

No. 345779
Oakland Circuit Court
Family Division
LC No. 2017-856888-NA

Before: CAMERON, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

In this child protective proceeding, petitioner, the Department of Health and Human Services (DHHS), sought temporary jurisdiction of respondent's children after the children's mother and custodial parent (mother) died on August 21, 2017. Petitioner determined that it would be inappropriate to place the children with respondent-father, who was precluded from having unsupervised contact with the children pursuant to an interim custody order in a pending divorce case. Petitioner appeals the trial court's October 5, 2018 order dismissing the petition and declining to exercise jurisdiction over respondent's two daughters, AA and SA, under MCL 712A.2(b)(1) and (2). For the reasons set forth below, we reverse and remand for further proceedings.

## I. FACTUAL BACKGROUND

Respondent and mother were married in 1998. They have three children: a son (MA) and two daughters (AA and SA). On February 14, 2016, a confrontation between respondent and mother became physical, and respondent was arrested and removed from the family's home. As he was being led out of the home, respondent told AA: "This is all your fault." Respondent was released from jail on February 15, 2016, charged with domestic violence, and ordered to stay away from the home as a condition of his bond. He violated this bond condition and, on February 23, 2016, was again arrested. As a result, respondent was placed on a tether. After the

-1-

February 14, 2016 assault, mother filed for divorce.[1] Ultimately, respondent pleaded no contest to a charge of domestic violence and was sentenced to probation, placed on a tether, and ordered to have no contact with mother or the family home.

Pursuant to a 2016 interim custody order, after respondent moved out of the family home, mother had sole physical custody of the children, all of whom were then teenagers or nearly teenagers. Respondent's contact with the children was limited to supervised visitation. Respondent's parenting time was only to occur at a counseling center or under the supervision of an "agreed upon third-party." The order precluded respondent from having direct contact with his children.

Although the order allowed respondent to participate in supervised parenting time, he never exercised any visitation or parenting time with his daughters after the interim custody order was entered. However, MA did sneak out of the family home and spend nights with respondent. AA claimed that she frequently saw MA get into respondent's car that was parked down the street from their house. According to AA, mother was aware of this contact but she was reluctant to stop the visits because conversations with MA frequently escalated and became physical when she attempted to intervene or question his behavior.

In August 2017, mother and the three children were still living in the family home. On the morning of August 21, 2017, mother's body was found lying outside on the patio, directly below a third-floor window. After AA discovered mother's body, she called 911. Mother was pronounced dead later that morning. After the police arrived, they directed AA to contact respondent. AA complied despite that she had only seen respondent once in nearly 18 months and that respondent was prohibited from being present in the family home.

Respondent stayed with his children in the family home for approximately two days. During this time, the police investigated mother's death and determined that it was not accidental. The police arrested 16-year-old MA, who was charged with first-degree murder. The police also contacted Child Protective Services (CPS) because 15-year-old AA appeared to be afraid of respondent.

During the brief investigation that ensued, CPS learned of (1) the custody order that precluded respondent from having unsupervised contact with his children; (2) respondent's domestic violence conviction arising out the events on February 14, 2016; and (3) respondent's February 2017 conviction of Medicaid and insurance fraud, which resulted in the suspension of his license to practice medicine. AA also disclosed to the CPS investigator that she was afraid of respondent and that she had witnessed domestic violence in the home on more than one occasion. The investigator also learned of a "proposed custody order" that the parties had signed a week before mother's death, which would have permitted respondent to have custody of MA, and unsupervised parenting time with AA and SA every other weekend. This order was presented to the court in the divorce case, but it was never entered by the court. In light of the foregoing

---

[1] The divorce case was pending before the same judge who presided over this child protective proceeding.

circumstances, petitioner sought court intervention. In the interim, a safety plan was established on August 22, 2017, which included permitting AA and SA to stay the night with a family friend. MA was in police custody.

On August 24, 2017, petitioner filed a petition requesting that the court remove the children from respondent's care and take temporary jurisdiction over MA, AA, and SA. Petitioner alleged that:

> It is contrary to the welfare of these children to remain in the care and custody of their father, [respondent]. On 8/21/17, mother . . . died after being thrown out of a 3rd story window of the home. It was determined that [MA] had thrown his mother and has been arrested. There is a history of domestic violence in the home between [respondent] and [mother]. [Respondent] is currently on probation for domestic violence and is on a GPS tether. He is only allowed supervised visits with the children. However, [respondent] has not see [sic] the children in over a year. [AA] reports that she is fearful of her father.

With respect to domestic violence in the home, the petitioner further alleged:

> [Respondent] and [mother] has [sic] a history of domestic violence that was [sic] involved their children. On 2/14/2016, [AA] called 911 reporting that her parents were pushing each other. Due to the domestic assault, [mother] received an abrasion to her arm and a cut to her index finger. [Respondent] was arrested and a no contact order was put into place. On 2/23/2016 it was discovered that [respondent] had violated the no contact order by returning to the family home to reside since 2/15/2016. [Respondent] was arrested for violation of the no contact order and placed on a GPS tether. On March 23rd 2016 [sic], [respondent] was sentenced to probation for 24 months and 93 days of jail, suspended, for domestic violence. [Respondent] is only allowed supervised visitation with the children pursuant to the divorce judgment. [Respondent] has not seen [AA] or [SA] in over a year.[2]

On that same day, the court entered an ex parte order permitting petitioner to remove the children from respondent's care. After MA was charged with his mother's murder, he was removed from the petition.

The petition was authorized on September 6, 2017. In the 13 months that followed the authorization of the petition, the court held numerous hearings as the case worked its way toward an eventual multi-day adjudication trial. Many hearings were held to address issues related to

---

[2] The petition originally included an allegation that respondent appeared at the family home on August 21, 2017, in violation of the no-contact order. However, because it was agreed that respondent came to the house at the request of the police, this allegation was struck from the petition.

the children's pretrial placement. Indeed, the court adjourned the continuing adjudication trial several times to address a multitude of issues related to the children.

Several hearings were held related to AA's fragile mental health and her refusal to attend visitation with respondent. During these proceedings, SA, who is developmentally disabled, was returned to respondent's care under DHHS supervision. The record reveals that everyone involved with the children were also sensitive to the cultural and religious needs of the family and the trauma the children had experienced following their mother's death.[3]

The adjudication trial was held in March 2018. At the conclusion of the trial, the court indicated that it would take the matter under advisement and issue a written opinion. Approximately a month later, however, the court sua sponte reopened proofs to examine mother's divorce attorney, Robert J. Zivian. According to the order, Zivian would be questioned regarding the proposed custody order, purportedly signed by mother the week before her death, which would have allowed respondent custody of MA and unsupervised weekend visitation with the girls. The court also indicated that it would recall and examine AA, and possibly call SA. Consequently, the court took additional testimony from AA and Zivian over three days between April and May 2018.

On October 5, 2018, the court issued an opinion and order declining to exercise jurisdiction over the children and dismissing the petition for temporary custody. The court found that a preponderance of the evidence did not establish the existence of a statutory ground to exercise jurisdiction over the children. The court specifically held that there was no evidence that respondent failed to provide proper care and custody for his children. The court also concluded that evidence of domestic violence in the home was insufficient to confer jurisdiction on the court. With regard to the February 14, 2016 domestic assault, the court found that this was the only evidence to substantiate a "history of domestic violence" in the home. It then seemed to conclude that because DHHS never filed a petition with regard to this assault until 18 months after the fact, the assault was insufficient for the court to exercise jurisdiction. The court acknowledged that petitioner had attempted to elicit testimony regarding an assault that reportedly occurred in London, but then concluded that this incident of domestic violence was not alleged in the petition and "there was no indication that any party had information that related to the unalleged incident." After engaging in the foregoing analysis, the court declined to exercise jurisdiction over the minor children.

Petitioner now appeals as of right. This Court has stayed further proceedings pending resolution of this appeal.

## II. DISCUSSION OF THE ISSUES

Petitioner argues that the trial court erred by declining to exercise jurisdiction over the children. We agree.

---

[3] According to AA, her parents wanted the children to focus more on their Muslim faith.

This Court reviews a trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). A trial court's finding of fact is "clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 296-297.

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock,* 442 Mich 101, 108; 499 NW2d 752 (1993). The adjudicative phase determines whether the trial court may exercise jurisdiction over the children. *Id.* To properly exercise jurisdiction, the trial court must find that a statutory basis for jurisdiction exists. *In re BZ*, 264 Mich App at 295. Whether a court has jurisdiction is determined by a parent's plea, or by the court or jury at trial. *In re Kanjia*, 308 Mich App 660, 664; 866 NW2d 862 (2014). If a trial is held, the trier of fact must find that one or more of the statutory grounds for jurisdiction have been proven by a preponderance of the evidence. *In re BZ*, 264 Mich App at 295. "Proof by a preponderance of the evidence means that the evidence that a statutory ground alleged in the petition is true outweighs the evidence that that statutory ground is not true." M Civ JI 97.37.

The petition sought jurisdiction under MCL 712A.2(b)(1) and (2), which permit a trial court to exercise jurisdiction over a minor child in the following circumstances:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . .

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

In support of these statutory grounds, the petition alleged, in relevant part, that (1) the children's mother had died by violent means, (2) there was a history of domestic violence in the home, (3) respondent was currently on probation for a domestic violence conviction, (4) pursuant to a custody order, respondent was allowed only supervised visits with his children, (5) respondent had not seen his daughters for more than a year, and (6) AA reported being fearful of respondent. With respect to domestic violence in the home, the petition alleged a specific incident occurring on February 14, 2016, that AA witnessed and that resulted in physical injury to mother. After reviewing the entire record, we conclude that the allegations in the petition were established by a preponderance of the evidence and support a statutory basis for jurisdiction under MCL 712A.2(b)(1) and (2). Accordingly, the trial court clearly erred when it declined to exercise jurisdiction over the children.

The evidence established that at the time of mother's death, SA and AA were left without proper care and custody because there was no other adult immediately available to care for the children in mother's absence. Respondent was precluded from taking custody of the children by

an interim custody order limiting his contact with the children to supervised parenting time. This order was entered following an incident of domestic violence in the family home on February 14, 2016. AA, who was present during this event, gave credible testimony that respondent physically assaulted mother, causing bruising, scraping, and a small cut to her finger. A police evidence technician who photographed mother's injuries testified that respondent was arrested because the physical evidence corroborated mother's version of the events. Respondent admitted that he pleaded no contest to an ensuing charge of domestic violence and was sentenced to 24 months' probation. The terms of his probation included no contact with mother and no entry into the family home. Moreover, because respondent had violated the terms of his bond by remaining in the house after his February 14, 2016 arrest, respondent was also subject to electronic monitoring.

The evidence further demonstrated that the February 2016 incident was not an isolated event but instead was indicative of a pattern of domestic violence. AA specifically testified that what occurred on February 14, 2016, between mother and respondent had happened before. Indeed, AA testified that respondent previously had abused mother to an even greater degree. She explained that, although the bruising that mother incurred that day in February 2016 was significant, "it wasn't as big as what he had done to her before." When mother implored AA to call the police on the morning of February 14, 2016, AA complied. AA explained that she called 911 because it was "just like a build of events like what I've been seeing him doing to my mother, it just led up to it and it was like the final straw."

There was also a significant incident in January 2016, after the family returned from a trip to London. Although the court precluded AA from testifying in detail regarding what transpired after the trip, she did confirm that the "London incident" was similar to the February 2016 incident. According to AA, respondent and mother were arguing to the degree that AA characterized the events as another incidence of domestic violence. AA also described a separate incident where mother and respondent were arguing and mother, because she did not feel safe, insisted that AA sleep between her and respondent in their bed. Indeed, on more than one occasion, mother would sleep with one of her daughters because she feared respondent.

AA's recounting of domestic violence in the home was corroborated by the testimony of Officer O'Neill, a CPS investigator, and Zivian. AA disclosed to both O'Neill and the CPS investigator that there had been other incidents of domestic violence in the home. Although Zivian frequently invoked the attorney-client privilege during his testimony, he explained that, based on information gleaned outside the scope of the privilege, he was aware of incidents of domestic violence other than the February 14, 2016 incident. Zivian was concerned enough about respondent's volatility that a meeting between Zivian, mother, respondent, and respondent's divorce attorney took place in the court's jury room. Zivian explained that respondent was openly hostile to mother during this meeting, refusing to look at her and commenting that she was no longer human because she declined to wear a hijab, which caused Zivian to fear for mother's continued safety. Although petitioner argues that the trial court improperly restricted the scope of the testimony, the existing record was more than sufficient to establish that domestic violence was prevalent in the home and respondent was the perpetrator. "Evidence of violence between parents in front of the children is certainly relevant to showing, as provided under [MCL 712A.2(b)] that the home is an unfit place for the children by reason of criminality or depravity." *In re Miller*, 182 Mich App 70, 80; 451 NW2d 576 (1990).

It is also clear that AA's exposure to the domestic violence had taken a toll on her. On the morning of mother's death, the police called CPS, in part, because AA had disclosed that she was afraid of respondent. During questioning by the court, AA explained that her fear was that when respondent became mad, AA did not know to what extent he would react. AA stated that watching respondent abuse mother had caused AA to fear for her own future safety. AA explained, "I would see what he would do when he would get mad at my mom and think maybe if I'm a little older will he do the same thing to me." AA's fear for her future safety did not appear to be unwarranted. During the adjudication trial, AA described an argument that arose at a Panera Bread store the day after mother's death. Respondent refused to return AA's cell phone after he had used it to speak to AA's maternal grandfather. During their argument, respondent threatened to destroy AA's phone in the same manner AA had heard him threaten mother in the past.

Another source of AA's fear of respondent was related to MA's pending criminal trial. On the morning of mother's death, AA provided information to police investigators. Some of AA's statements directly contradicted what MA had told the police. AA agreed that her fear of respondent was related, in part, to the fact that respondent was aware that she had provided information that the prosecutor intended to use against MA.

There was also evidence that respondent emotionally neglected his daughters after he was court-ordered out of the home. Respondent acknowledged that the March 2016 interim custody order permitted him to have supervised visitation with his children at a counseling center or under the supervision of an agreed-upon third party. However, other than one encounter in May 2016 with AA, respondent admitted that he did not thereafter see AA or SA until August 21, 2017, the day mother died. Respondent claimed that he made one attempt to contact the counseling center to schedule a visit, but then did not pursue the matter further because he was not comfortable with supervised visitation. Respondent believed that visits of this nature were "deficient" and not a "healthy environment" for his children. Thus, the evidence established that respondent was willing to go 15 months without seeing his daughters simply because he did not like the fact that the conditions were uncomfortable for him. A parent's failure to maintain contact with a child is evidence of abandonment and neglect. *In re Hall,* 188 Mich App 217, 223-224; 469 NW2d 56 (1991). By contrast, while respondent voluntarily abandoned his daughters for more than a year, there was evidence that MA spent at least two nights a week with him in violation of the interim custody order.

Although not as compelling as the foregoing evidence, the court also heard testimony regarding respondent's 2017 fraud conviction. In February 2017, respondent pleaded guilty to two counts of Medicaid fraud and two counts of health insurance fraud. Following his convictions, respondent's medical license was suspended for six months, beginning July 2017. Thus, respondent demonstrated that he was willing to engage in criminal behavior for his own self-interest.

Considering the record in its entirety, the foregoing evidence demonstrated that the statutory grounds for jurisdiction under MCL 712A.2(b) had been established by a preponderance of the evidence. Evidence that respondent failed to have any contact with his daughters for more than a year established his neglect of and harm to his daughters' emotional well-being. Similarly, evidence that the children were exposed to an environment fraught with

domestic violence established that the children were subject to a substantial risk of harm to their mental well-being. Respondent's criminality, including the domestic violence and fraud convictions, established an unfit home environment. Accordingly, we conclude that the trial court clearly erred when it held that the evidence was insufficient to exercise jurisdiction over the children. Moreover, when reviewing the trial court's opinion, it is apparent that the court ignored salient evidence and made findings of fact that were simply unsupported by the record.

The court found that there was no evidence of improper supervision because respondent apparently complied with the financial support order entered in the divorce case. However, this finding ignores the fact that providing proper care and custody encompasses more than mere financial support. MCL 712A.2(b)(1) permits a court to exercise jurisdiction where a child has been subject to a substantial risk of harm to her mental well-being. As discussed earlier, exposing the children to domestic violence and failing to exercise parenting time with them for more than a year was harmful to their emotional well-being and constituted neglect.

The court also failed to consider the importance of respondent's conviction for health care fraud. Instead, the trial court concluded that this evidence was irrelevant because, according to the court, the CPS investigator testified that the "health care fraud issues were not relevant to the petition and should not be considered." This, however, was not an accurate characterization of the witness's testimony. When the court suggested that respondent's 2017 fraud conviction "really had nothing to do with this petition, does it," the CPS investigator replied, "No, not really, but we always run a background check for criminal activity, it's just standard practice." When the court then suggested that if it did not consider that provision, "that would be appropriate," the investigator replied, "Yeah, that - that really - his criminal record had nothing to do with abuse and neglect, except for the one - - incident in February." The investigator was overly literal in his interpretation of the court's questions. Moreover, we note that the investigator was never asked directly whether respondent's criminality, including his convictions for health care fraud and domestic violence, created an unfit home for the children to live in.

The court also failed to properly consider the significance of the interim custody order that limited respondent to supervised visitation and respondent's failure to visit his children for more than a year. Employing no analysis, the court simply found these factors were "insufficient for the court to take jurisdiction." The court ignored the emotional damage a child can experience by the absence of a parent from their lives for more than a year.

The trial court's reliance on the proposed custody order is also misplaced. Under the provisions of this proposed order, respondent and his wife apparently agreed that respondent would have custody of MA and be entitled to unsupervised parenting time with AA and SA every other weekend. The trial court in the divorce case did not sign this order when it was presented for entry. While the court never explained its reluctance to enter the proposed order, it did volunteer on the record in this case that mother's death had nothing to do with its lack of action because mother was still alive at the time the order was presented. In any event, the court considered the existence of the unsigned order as evidence and then apparently reasoned that, because mother had approved of this stipulation to a change in custody, she must have been comfortable with having AA and SA in respondent's unsupervised care. This very well could have been true, but whether mother signed the proposed order is not relevant to whether the trial court should exercise jurisdiction based on the grounds under MCL 712A.2(b)(1). When

considering the domestic violence, abandonment, and criminality in the home, the fact that mother was willing to allow unsupervised parenting time between respondent and his daughters is a minor consideration. The court's conclusion disregards the overwhelming amount of evidence that weighs in favor of exercising jurisdiction.

Additionally, Zivian warned against reading too much into the proposed order. Zivian testified that because the proposed order was never entered, it did not have any force or effect. Further, according to Zivian, the proposed order was not intended to be a resolution of the custody dispute; custody was still an issue that would have been addressed at the mediation that was scheduled for August 29, 2017. Zivian also testified that the proposed order included a provision that permitted a parent to communicate with a child by cell phone, e-mail, or other electronic means when that child was with the other parent. Zivian explained that the purpose of this provision was to make sure that there was communication available to the girls if they were with respondent and they needed to immediately call mother "to potentially rescue them from the situation." Consistent with Zivian's testimony, AA explained that when she learned about the proposed changes in the custody arrangement, she and mother had a conversation about staying safe when AA was with respondent. Mother instructed AA to call the police if she felt unsafe. Mother also directed AA to keep a password on the phone and not disclose it to anyone, including respondent. Clearly, the record did not justify the court's reliance on a proposed order that had not been entered and to which mother agreed to only because she assumed she would be alive to monitor the visitations.

We recognize that when reviewing a trial court's findings of fact, we generally defer to the special opportunity the trial court has to judge the credibility of the witnesses. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005). However, because this Court does actually review findings of fact for clear error, the regard given to the trial court does not rise to the level of blind deference. Moreover, clear error is present when this Court is left with a definite and firm conviction that a mistake has been made. In this case, the preponderance of the evidence established that respondent's history of domestic violence, which involved more than one incident in the presence of a minor child, presented a substantial risk of harm to the children's mental well-being. Moreover, respondent failed to provide support for the children's emotional well-being, and his criminal conduct created an unfit home environment. These factors were indicative of respondent's inability to provide proper care and custody to the children and an indication of a future likelihood of harm to the children. The trial court clearly erred when it failed to exercise jurisdiction over the children. Accordingly, we reverse and remand for entry of an order adjudicating the children as temporary court wards and for further proceedings.

In this appeal, petitioner also raises several evidentiary issues. However, in light of our finding that the existing record was sufficient to exercise jurisdiction over the minor children, we decline to address petitioner's additional claims of evidentiary error.

Petitioner also argues that this matter should be assigned to a different judge on remand. We agree. In determining whether to remand a case to a different judge, this Court considers

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected,

(2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. [*People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (citations and quotation marks omitted).]

Based on the record, we believe that the trial judge will have difficulty putting aside previously expressed views and findings. Moreover, reassignment is necessary to preserve the appearance of justice.

In its brief on appeal, petitioner cites a multitude of comments made by the court in its engagement with the assistant prosecutor in this case. The court's comments seemed to indicate that it had predetermined the outcome of this case and that respondent would comply with virtually everything that it ordered if it took jurisdiction over the case.

We also agree with petitioner that the court appeared to be an advocate for respondent's request that petitioner simply dismiss the petition in favor of a guardianship. Early in these proceedings, respondent's counsel indicated that respondent was willing to agree to a guardianship and that petitioner should simply withdraw the petition. Initially, the court questioned why respondent was not willing to enter a plea to jurisdiction and then a guardianship could be pursued using that avenue. However, respondent's counsel indicated that any plea in a child protective proceeding would adversely affect, perhaps even preclude, respondent from getting his medical license reinstated. Thereafter, the court questioned the assistant prosecutor[4] as to why the petitioner was not willing to pursue a guardianship. At one point, the court accused the assistant prosecutor of refusing a guardianship as "a tactical game." Throughout the proceedings, the assistant prosecutor frequently explained petitioner's position that a guardianship alone would not sufficiently protect the children, but that granting a temporary wardship would be appropriate because it would ensure court supervision and services.

Notwithstanding petitioner's stated motivation for pursuing a temporary wardship, the court frequently accused petitioner and the prosecutor's office of having no concern for AA's best interests. In July 2018, the court commented that it just did not see "what value DHHS is adding for this child in this proceeding whatsoever." The court further accused either petitioner or the assistant prosecutor of being "more concerned about [AA] being a witness [in a murder case] than you are about her wellbeing." When the court learned that the prosecutor assigned the murder case had met with AA at a Starbucks the night before her ACT examination, the court commented, "It's always been about the murder trial." The court further seemed to accuse the assistant prosecutor in the civil abuse and neglect proceeding of being responsible for the meeting.

After the court's decision, at a hearing on a motion to stay proceedings for purposes of this appeal, the court indicated that it was not satisfied with how the prosecutor's office was

---

[4] We note petitioner's interests were represented by the prosecutor's office as legal consultant. See *In re Blakeman*, 326 Mich App 318, 338; 926 NW2d 326 (2018).

handling the case. The court then articulated its belief that the current child protection case was essentially a "witness protection" program:

> *The Court*: You're – your're just making these dramatic leaps that you want me to buy into this is a witness protection program essentially. This is the prosecutor's office wants to make sure its witness is sterile with regard to whatever she's testifying to. That's what this is.
>
> [*Assistant Prosecutor*]: This is –
>
> *The Court*: You've never taken the care and concern for this child with regard to her medical, with regard to her counseling. You want her not to be able to have a discussion with her dad.
>
> *Assistant Prosecutor*: This is a circumstance –
>
> *The Court*: And you know what? The dad has said over and over, I'll give you a guardianship. Who do you want? I will give you a guardianship, anything you want, let me help this child. What does she want? But what does the prosecutor's office do?
>
> *Assistant Prosecutor*: We're afraid for her safety, Judge.
>
> *The Court*: Okay, but [sic] a guardianship in place.
>
> *Assistant Prosecutor*: A guardianship would not provide DHS involvement, which would help with visitation and other things as Miss Basha said. She said she would be willing with DHS assistance. The only way we get DHS assistance is maintaining DHS care and custody. There's no way to do that under a pure guardianship.
>
> * * *
>
> *The Court*: We had that in the court. We came here, yet you're using this girl as a pawn. You are, you're going – you want to worry about her emotional stability?
>
> [*Respondent*]: Thank you.
>
> *Assistant Prosecutor*: Judge –
>
> *The Court*: Then why isn't the prosecutor's office taking more care with her?

Clearly, the court expressed an unflattering view of both the prosecutor's office and the DHHS and their motivation for pursuing the temporary wardship. Considering the nature of the accusations leveled against the prosecutor and petitioner, the assigned judge would have

-11-

substantial difficulty putting out of her mind previously expressed views. For that reason, reassignment to a different trial judge is warranted on remand.

We reverse the trial court's order dismissing the petition, remand for entry of an order adjudicating the children as temporary wards of the court, and order that the case be reassigned to a different judge for disposition and further proceedings. We do not retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Jane E. Markey
/s/ Stephen L. Borrello