*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DINVERNO, Minors.

UNPUBLISHED
September 29, 2022

No. 360306
Jackson Circuit Court
Family Division
LC No. 21-003006-NA

Before: K. F. KELLY, P.J., and LETICA and RICK, JJ.

PER CURIAM.

Respondent-mother (respondent) appeals as of right the trial court's orders of adjudication and initial disposition. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

At the age of 15, respondent's eldest, now adult daughter, SD, was picked up from school by respondent. SD had recently learned about "good touch" and "bad touch" in school and disclosed that respondent's husband, the father (father) of their seven children including SD,[1] inappropriately touched her in the bathing suit area when she was nine years old. According to respondent, she advised SD that they could report father's conduct to the police or sign SD up for counseling. However, SD did not want to pursue either of those options and refused to discuss the abuse in any detail. Respondent questioned whether the other children were abused but SD did not think so. Thus, at SD's request, respondent made no attempt to obtain services for SD to address what had happened to her.

In November 2020, law enforcement received an allegation that father may have a history of sexually abusing children, potentially in his own family. The case, however, was closed after the family failed to comply with the investigation. On September 3, 2021, the current petition was filed by the Department of Health and Human Services (DHHS) seeking to assume jurisdiction over the minor children that included sons ND, ID, and ED, and daughter LD. According to this

---

[1] Father was also named in the petition, but he requested a jury trial for the adjudication. Because of the pandemic, respondent's bench trial adjudication was held first.

petition, now 22-year-old SD disclosed that she was abused between the ages of 9 and 15 years old. During this period, SD allegedly advised respondent about the abuse on two occasions and also wrote respondent a letter. SD revealed that inappropriate acts of affection occurred with father while SD was naked even in common areas of the family home. Additionally, according to the petition, daughter LD expressed to SD that she was being abused by father and requested that SD remove her from the family home. There were further assertions that all the children were physically abused by father and that he committed domestic violence on respondent. Yet, when the minor children, except ED, were interviewed in late August 2021, they did not make any disclosures.[2]

According to the petition, respondent and father were interviewed. Respondent reportedly indicated that she would have difficulty calling the police on father and that he was physical toward her. Additionally, father allegedly made admissions about the abuse of SD and apologized to her. An emergency hearing was held. Father moved from the family home, but the minor children remained there with respondent.

At the bench trial on the adjudication, respondent testified that she was the mother of four children subject to the petition. She also had two adult children, SD and JD. Respondent testified that SD disclosed sexual abuse by father when she was 15 years old, that she discussed options with SD that involved calling the police or counseling, and that SD refused to talk to anyone about the abuse. Respondent determined that her other children were safe because SD did not believe that anything happened to the other children. Respondent did not independently decide to call the police, schedule counseling, or schedule medical examinations for any of her children.

Respondent testified that, as a child, she kissed her parents good night which involved a hug and a "peck" and then she went to sleep. She started this tradition with her own children because she thought it was "very sweet," and it was called "kissing daddy goodnight." Respondent acknowledged that SD, when in fifth or sixth grade, expressed that she was uncomfortable with the routine. Consequently, respondent advised father that the practice had to stop because SD outgrew it.

Respondent also acknowledged that father was the disciplinarian in the family, but she did not have any concerns with the degree or extent of his punishments. When SD was only two years old, the parents took a course entitled "Growing Kids God's Way" at the home of a pediatrician. This course taught corporal punishment, and through it, the parents acquired a spanking stick. For the last ten years, however, the parents determined that graduated punishment such as timeouts and removal of privileges or electronic devices was more effective.

Respondent denied that she would be afraid to call the police on father. She noted that her son MD who died on June 4, 2020, was prone to violent outbursts and destruction of property, and she called the police to intervene. Additionally, respondent had to call the police or emergency personnel when JD suffered from emotional issues because he was diagnosed with a psychiatric condition and when ED suffered from health issues. Respondent did not have reservations about father returning to the family home because the abuse of SD only occurred when she was 9 years

---

[2] ED was born with a condition that rendered him non-verbal and confined him to a wheelchair.

old, father did not treat SD differently after the abuse was revealed, and none of the minor children exhibited behaviors consistent with abuse. Although respondent would allow father to return, she admitted that SD recently provided more troubling details to respondent about the abuse.

In addition to respondent's testimony, Jackson County Sergeant Bryan Huttenlocker testified that he conducted an interview with respondent. At that time, respondent advised that father was physical to her. But Huttenlocker could not recall if respondent mentioned physical abuse of the children.

At the conclusion of this testimony, respondent moved to dismiss the petition against her or to name her as a non-respondent.[3] The trial court acknowledged that there was no presentation of evidence or disclosure that the minor children named in the petition were abused. Even so, the doctrine of anticipatory neglect did not require proof that the minor children were abused; rather, the sexual abuse of a sibling was sufficient. The trial court also noted that respondent appeared to love her children but chose to do nothing about the allegation of abuse simply because the 15-year-old was reluctant to proceed. Nevertheless, respondent did not hesitate to call the police or emergency personnel for issues involving MD, JD, and ED. Further, the trial court questioned the reasons that the children were acting out. Thus, the trial court concluded that the evidence established a "substantial risk of harm to the mental well-being of these children" and decided to adjudicate and assume jurisdiction over the minor children. When apprised that only the motion to dismiss was raised and that respondent had not yet presented evidence, the trial court acknowledged that it "jumped the gun" and would consider any additional evidence.

Recalled to the stand, respondent testified to the nature of each child, any issues the child experienced, and how the issues were addressed. Respondent testified that MD would go into a rage, kick walls, throw chairs, and start fights with father. Respondent called 911 many times such that the police knew MD's name. Respondent tried to take MD to counseling but he refused. Shortly before MD's death in June 2020, he started to see a counselor to become a better person. Although the autopsy indicated that MD's death was the result of an "unknown cause," respondent opined that he accidentally overdosed on drugs because he used marijuana and "Kratom." Respondent denied that MD blamed or had a bad relationship with father.

According to respondent, JD was a social child but struggled in school. After JD was given a "weed muffin" at school and the police were called, JD's behavior started to change. JD became destructive while the family was on vacation and had to be driven home. Once home, he threw items into the pool and expressed fear that respondent would be electrocuted. He was taken in for psychiatric treatment for a few weeks and medicated. JD did not want to continue on the medication because it caused weight gain. After MD's death, JD suffered a mental breakdown, walked around naked, and claimed to be Jesus. He was hospitalized for a year, but respondent opined that he did not blame father for his issues.

---

[3] The guardian ad litem initially agreed with respondent's motion to dismiss. She cited the facts that SD was unable to testify, there were restrictions on communications between respondent and father, the testimony was "a little weak," father was out of the home, and the children were not in imminent danger.

ND had a speech impediment when growing up but was placed in speech therapy. He participated in athletics and was preparing to go to college. Similarly, ID was a good student who participated in extra-curricular activities.

LD, the youngest daughter, was "really shy," and had behavioral issues similar to MD. She was anxious and acted out but was also reserved and afraid of new situations. LD was placed in therapy in order to address the transition from home-schooling to a regular school. School officials reported that LD engaged in selective mutism. But respondent testified that LD was merely shy in school and a "chatterbox" at home. Additionally, respondent opined that LD was not abused because she told respondent everything. Again, respondent testified that she did not see any change in the children's behavior that was indicative of abuse.

The parties reiterated the same arguments raised in the context of the motion to dismiss. Counsel for DHHS noted that respondent called the police 10 times for safety concerns in her home but chose to do nothing after SD disclosed her abuse. Respondent's counsel asserted that there was no substantial risk of harm for choosing not to act at the time of SD's disclosure. Furthermore, respondent noted that calling the police would have exposed SD to "mental turmoil and angst" noting that SD had been "hospitalized twice just with this case pending."[4] He further argued that the court could not offer much assistance to the family by assuming jurisdiction because JD and LD were receiving counseling and support from the family while ND and ID were model students engaged in athletics. The GAL opined that respondent's testimony did not necessarily help her, and the GAL now supported adjudication in light of the trial court's prior finding.

The trial court stated that the additional testimony did not change its view of the case when it denied the motion for directed verdict. It again concluded that the doctrine of anticipatory neglect applied. Furthermore, respondent's statement that she was comfortable with father in the home was troublesome in light of SD's disclosures at age 15, SD's recent more detailed disclosures, and father's admissions of extremely troubling behavior as delineated in the petition, although not yet proven. The trial court determined that the children were not safe if father returned to the home and questioned respondent being tasked with the decision to allow father into the home in light of her testimony.

Respondent moved for reconsideration, alleging that the statute establishing jurisdiction "speaks in the present tense," and the court must "examine the child's situation at the time the petition was filed." It was further alleged that the trial court improperly applied the doctrine of anticipatory neglect because respondent did not abuse or neglect the children; any allegation of abuse pertained to father. Lastly, respondent did not have to be a model or ideal parent, but only adequate. Therefore, it was asserted that the court erred in its assumption of jurisdiction, and on reconsideration, it should correct this error.

---

[4] Respondent's counsel also stated that, "It took six years for [SD] to disclose anything so we might have to wait six years for [LD] to disclose anything. That's completely fair."

The trial court adjourned the dispositional hearing to address the motion for reconsideration. The trial court continued to apply the doctrine of anticipatory neglect; that is how a parent treated one child was indicative of how she would treat another.[5] Despite the serious allegations raised by SD against father, respondent indicated that she was comfortable with father returning to the home. Although LD did not make any disclosures, she became mute at school. Thus, it was questionable whether the failure to protect was ongoing. The trial court denied the motion for reconsideration concluding it made the correct decision in assuming jurisdiction.

Once the motion for reconsideration was denied, the trial court proceeded to conduct the dispositional hearing. The DHHS caseworker recommended that respondent have a psychological evaluation and follow-up. She also recommended a trauma assessment for LD. Additionally, the caseworker learned that respondent went over the most recent court report with LD, an interaction that upset the child. The caseworker requested that respondent not share information or discuss the case with the minor children. The trial court adopted these recommendations. It agreed with respondent's request that ND[6] and ID not submit to psychological evaluations at that time. From these rulings, respondent appeals.

## II. STANDARDS OF REVIEW

The interpretation and application of statutes and court rules is reviewed de novo. *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). De novo review means the appellate court may address the issue independently without deference to the lower court decision. *Id*. When the trial court renders factual findings, appellate review is for clear error. *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). A trial court's factual findings are clearly erroneous if there is evidentiary support, but the appellate court is definitely and firmly convinced that a mistake was made. *Id*. at 709-710.

## III. ADJUDICATION

Respondent alleged that the trial court erred in assuming jurisdiction because: (1) DHHS failed to meet its burden of proving that the children were in actual harm's way and that respondent failed to protect them; (2) respondent was an adequate parent; and (3) anticipatory neglect did not apply. We disagree.

Following an investigation, the DHHS may file a petition requesting that the court take jurisdiction over a child. *In re Mota*, 334 Mich App 300, 312; 964 NW2d 881 (2020). The petition must delineate essential facts that, if proven, would allow the court to assume and exercise jurisdiction of the child. *Id*. (citations omitted). If the petition is authorized, the adjudication phase occurs. *Id*.

Child protective proceedings are comprised of two phases, the adjudicative phase and the dispositional phase. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). Generally, during

---

[5] The GAL supported the denial of reconsideration. The GAL cited the "impression" or "instinct" that respondent was also a victim at the hands of father.

[6] After the dispositional ruling, ND reached the age of 18 and was dismissed from the petition.

the adjudicative phase, the court determines whether it can take jurisdiction over the child in the first place. *Id*. Jurisdiction may be acquired in two ways. The parent may plead to the allegations in a jurisdictional petition, or a party may demand a trial before a judge or jury to contest the allegations. *In re Thompson*, 318 Mich App 375, 378; 897 NW2d 758 (2016). Once jurisdiction is taken by the court, it determines what action will ensure the child's safety and well-being during the dispositional phase. *Sanders*, 495 Mich at 404.

> If a trial is held regarding adjudication, the respondent is entitled to a determination of the facts by the jury or judge, the rules of evidence apply, and jurisdiction must be established by a preponderance of the evidence. The dispositional phase involves a determination of what action, if any, will be taken on behalf of the child. Unlike the adjudicative [trial], at the initial dispositional hearing the respondent is not entitled to a jury determination of the facts and, generally, the Michigan Rules of Evidence do not apply, so all relevant and material evidence is admissible. [*In re Mota*, 334 Mich App at 312-313.]

Once an adjudicative proceeding is conducted, the court may immediately hold a dispositional hearing. *In re Thompson*, 318 Mich App at 379. However, the two proceedings may not be converged such that there is no distinction between the two. *Id*.

By statute, the trial court is authorized to conduct adjudicative and dispositional proceedings. See *Sanders*, 495 Mich at 404; see also MCL 712A.2(b). MCL 712A.2(b) provides, in pertinent part:

> Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship . . . .

Thus, by statute, the court may acquire jurisdiction over minor children when a respondent, being legally responsible for the care and maintenance of her children "neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals[.]" Jurisdiction must be established by a preponderance of the evidence. *In re Mota*, 334 Mich App at 312-313. The trial court's factual findings are reviewed for clear error. *In re White*, 303 Mich App at 709. A trial court's factual findings are clearly erroneous if there is evidentiary support, but the appellate court is definitely and firmly convinced that a mistake was made. *Id*. at 709-710.

## A. APPLICATION OF THE TESTIMONY TO THE STATUTE

We conclude that the trial court's factual findings were not clearly erroneous, and jurisdiction was established by a preponderance of the evidence. According to the petition, SD disclosed that she was sexually abused by father not just at the age of 9, but between the ages of 9

and 15. Additionally, SD alleged that there was more involved than merely inappropriate touching over the clothing. SD, however, did not testify at the adjudication because she was hospitalized.

On the other hand, respondent testified that her children were doing extremely well and did not manifest behaviors from sexual abuse. She cited to the fact that ND and ID were honor roll students and engaged in extracurricular activities, including sports. Although respondent acknowledged that there were problems with some of her children, she explained that it did not have to do with sexual or physical abuse. Respondent testified that MD suffered from an anger problem, that he destroyed property when he became angry, and that she called the police on him on multiple occasions contrary to MD's wishes. Although respondent indicated the autopsy report identified MD's cause of death as unknown, she attributed it to an accidental drug overdose, citing MD's use of marijuana and Kratom. With regard to JD, respondent attributed his psychological problems to being caught with a weed muffin at school and the death of MD. Addressing LD, respondent noted that this child was home-schooled until the middle of sixth grade when ED required more attention. Respondent then enrolled LD in school and reported that LD had trouble adapting. Although school officials reported that LD engaged in selective mutism, respondent asserted that LD was shy and had difficulty adjusting to the school environment. She did not like having multiple teachers for different subjects and the need to remember all the course books. Respondent explained that LD was a chatterbox in the car and at home and respondent was confident that LD would disclose abuse if it occurred but she did not. Thus, respondent did acknowledge that children other than SD suffered from mental distress and offered explanations for the conduct that did not involve sexual or physical abuse.

According to the petition, respondent indicated that she would be afraid to call the police on father and that he was abusive. At the adjudication, respondent clarified that she would call the police on father but would have trouble making the phone call in front of him, and therefore, she would ask him to leave first. She made no allegations of domestic violence in her testimony.

The trial court did not err in assuming jurisdiction over the minor children. As an adult, SD reported that she was sexually abused by her father between the ages of 9 and 15. She purportedly reported the allegations to respondent in person and via a letter. Respondent inquired of 15-year-old SD if the other children were safe and what course of action SD preferred. Contrary to respondent's allegation on appeal, there was no indication that respondent interviewed the other children to determine if they were safe. Additionally, respondent allowed SD, then a minor child, to determine the course of action, or rather inaction, to be taken. Yet, when MD destroyed property, when JD suffered a mental breakdown, or when ED required medical treatment, respondent acted as the adult and called police or emergency personnel to her home. But when sexual abuse was disclosed, respondent allegedly allowed SD to decide that no remedy or discussion would occur. Furthermore, although respondent acknowledged that JD and LD suffered from issues, she gave explanations for their behavior that did not involve abuse.

In light of the allegations by SD as a teenager, respondent's acknowledgment that she was apprised of the abuse, her decision not to take any action on SD's allegations, father's admissions in a letter purportedly to DHHS, and current problems experienced by some of respondent's children, the trial court did not err in assuming jurisdiction over the minor children. It is questionable whether the problems arising with MD, JD, and LD were the product of a dysfunctional abusive environment or for the explanations posited by respondent. Respondent

testified that she raised athletic, honor roll students in ND and ID. Although she acknowledged that JD and LD experienced mental distress and that MD died, she attributed MD's death to an accidental drug overdose and JD and LD's problems to the death of MD or the attendance at school. However, it is plausible that the explanations offered by respondent were not true. We defer to the trial court's assessment of the credibility of the witnesses. *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014). The trial court did not accept respondent's explanations for her children's problems and expressed concern about respondent's ability to protect the children from father. In light of the fact that SD, as an adult, experienced mental breakdowns and that MD died allegedly from a drug overdose, DHHS correctly filed a petition to determine whether LD was being adequately cared for and protected by respondent to prevent her from experiencing the same fate as SD, and that the other children's issues were addressed and did not arise from physical abuse.

Respondent's counsel repeatedly and overwhelmingly cites to the fact that the minor children "made no disclosures." Respondent's counsel further argued in the trial court that "we" may have to wait six years for LD to make any disclosures of abuse. It is contrary to the laws created to protect children to suggest that, after learning of the abuse of SD, to which father purportedly made admissions, that the appropriate recourse or discussion is not to ensure that LD is protected from sexual abuse. For counsel to posit that because of a lack of cooperation or disclosures by the children, the issue will simply be resolved if LD chooses to disclose any abuse as an adult ignores the role of DHHS and court intervention to prevent abuse. Moreover, there were allegations in the petition to demonstrate why LD would not disclose any abuse. Indeed, when SD disclosed abuse, respondent did not take action to stop it. Although respondent alleges that she told father to stop the conduct, it appears that her testimony was actually that she told father to stop engaging in "kissing daddy goodnight" because SD outgrew this behavior. It was not apparent that the abuse only occurred at night. From the record, we could not conclude that, after SD's disclosure at age 15, that respondent individually questioned each child to determine their interactions with father to assess whether sexual or physical abuse was occurring to other children. Instead, respondent merely questioned whether SD *believed* the other children were being abused. It was not the role of the 15-year-old to police father and his interactions with her siblings.

## B. ADEQUATE PARENTING

To the extent that respondent submits that she need not be a perfect or model parent, but only an adequate one, the adequacy of respondent's parenting was subject to dispute. Respondent demonstrated that she did not hesitate to call the police or emergency personnel when her other children suffered anger, emotional, or physical issues despite the children's wishes to the contrary. Yet, she gave SD the job of determining whether sexual abuse of father would be revealed to the police or a counselor.

Additionally, although respondent testified that ND and ID were honor roll students and athletes, she acknowledged that MD, JD, LD, and ED had issues that required intervention by police, emergency personnel, or counselors. Respondent concluded that the problems experienced by her children had no link to physical or sexual abuse despite SD's allegations and recent more detailed disclosure. The trial court properly questioned the adequacy of respondent's parenting and her ability to protect the children from father under the circumstances.

It was appropriate for the court to assume jurisdiction under MCL 712A.2(b) to determine whether the behaviors were adolescent or mental health issues or caused by abuse that the minors suffered in the home from which respondent failed to protect them. If respondent attributed her children's problems to other causes instead of addressing physical or sexual abuse by father, she subjected the children to a substantial risk of harm to their well-being. MCL 712A.2(b)(1). The trial court did not err in assuming jurisdiction of the children under the circumstances.

## C. ANTICIPATORY NEGLECT

Respondent contends that the doctrine of anticipatory neglect was inapplicable. As noted, the interpretation and application of statutes and court rules is reviewed de novo. *In re Ferranti*, 504 Mich at 14. MCL 712A.2(b)(1) allowed the court to take jurisdiction over the minor children when the parent "legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary, support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being[.]" Respondent submits that the statute is written and applied in the present tense. Indeed, in *In re MU*, 264 Mich App 270, 278-279; 690 NW2d 495 (2004), this Court agreed with "the respondent's rather unremarkable argument that the petition must establish that [the inappropriate behavior or] criminality rendered the home or environment unfit at the time the petition was filed" because the "statute speaks in the present tense[.]" Accordingly, the trial court examined the child's situation at the time the petition was filed. *Id*. at 279.

The doctrine of anticipatory neglect provides that how a parent treats one child is probative of how that parent may treat other children. *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020). In cases with multiple children, the doctrine may be applied to confer jurisdiction. *Id*. However, *the second child need not be abused or neglected as a prerequisite for jurisdiction over that child and the application of anticipatory neglect. Id*. (citation omitted). The fact that there are statutory grounds presented to assume jurisdiction over one minor child does not necessarily mean that there are statutory grounds to assume jurisdiction over a second minor child. *Id*. at 254. "[T]he doctrine of anticipatory neglect allows an inference that a parent's treatment of one child is probative of how that parent may treat other children." *Id*. at 259. However, the probative value of any inference decreases in light of differences between the children such as age or medical conditions. *Id*.

In the present case, respondent does not allege that there are significant differences between SD and LD that preclude the application of the anticipatory neglect doctrine. Rather, respondent seemingly submits that the trial court erred in relying on anticipatory neglect because DHHS failed to prove that SD was sexually abused, and that LD is currently being sexually abused. But DHHS was not required to prove that sexual abuse occurred to one or both siblings. Rather, in the context of respondent, the doctrine applied to show that respondent's treatment of SD was probative of how she would treat LD. Specifically, it appeared that respondent treated SD's disclosure of abuse with indifference. That is, she posited that SD could report the allegations of abuse to the police or seek counseling. She gave the authority to act upon the 15-year-old and did not take action. Yet, when faced with violent outbursts by MD, psychological outbursts by JD, and medical issues of ED, respondent readily called the police or emergency personnel. Thus, although LD was experiencing emotional turmoil and school officials alleged that LD chose to be selectively mute, respondent attributed it to a change from home schooling to a regular school. It did not appear

that respondent investigated whether father played a role in any abuse. Moreover, in light of father's reported admission and apology to SD regarding the abuse, it seemed imperative that respondent discuss the relationship between father and the children, especially LD. Although respondent submitted that LD would disclose any abuse because of their open relationship, LD was provided the example that when SD raised allegations of abuse, respondent did not engage in any action. Because DHHS was not required to prove current abuse of LD for purposes of anticipatory neglect, respondent's challenge to the application of the doctrine does not have merit.

## IV. DISPOSITION

Respondent contends that the trial court erred in its dispositional order following the adjudication. We disagree.

After a trial court assumes jurisdiction, its dispositional orders are entitled to considerable deference on appeal. *In re Blakeman*, 326 Mich App 318, 331; 926 NW2d 326 (2018). The trial court's dispositional orders are reviewed for clear error. *Id.*

Respondent submits that because there was no disclosure by LD and because LD's therapist opined that she was not sexually abused, it was inappropriate to order a trauma assessment. Although school officials apparently determined that LD was engaged in selective mutism, respondent opined that LD was merely shy at school. Respondent alleged that LD's therapist opined that the child was not sexually abused, but the therapist did not testify at the dispositional review hearing. Because the trial court correctly assumed jurisdiction, respondent failed to delineate how the trauma assessment constituted a fishing expedition or harm to LD. Indeed, the DHHS caseworker noted that the purpose of the services ordered was to determine what direction should be followed in caring for the children and the need for additional services. To respondent's credit, she raised two children who were honor students and athletes. But SD disclosed abuse and had recently suffered two hospitalizations, MD suffered from violent outbursts and died from an alleged accidental drug overdose, and JD suffered from two mental breakdowns. In light of the circumstances, a trauma assessment was appropriate to determine if LD was physically or sexually abused or suffered from emotional turmoil in light of the tragic events that occurred involving her siblings. Moreover, it was inappropriate for respondent to discuss the case with LD and potentially indicate that LD's allegations may have caused the family separation. Under the circumstances, it cannot be concluded that the trial court clearly erred in its dispositional order.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Anica Letica
/s/ Michelle M. Rick

-10-