*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HUDSON, Minors.

UNPUBLISHED
February 22, 2024

Nos. 366099; 366374
Kent Circuit Court
Family Division
LC Nos. 20-050477-NA; 20-050478-NA

Before: HOOD, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

In this consolidated appeal,[1] respondent-mother and respondent-father appeal as of right the trial court's orders terminating their parental rights to the minor children, LH and BH. The trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(b)(*ii*), (c)(*i*), (g), and (j), while respondent-father's parental rights were terminated under MCL 712A.19b(3)(c)(*i*), (j), (k)(*ii*), and (m)(*i*). We affirm.

## I. STANDARD OF REVIEW

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). We review the trial court's determination for clear error. *Id.*; MCR 3.977(K). After the trial court determines that at least one of the statutory grounds has been met, the trial court must then find by a preponderance of the evidence that termination is in the children's best interests before it can terminate parental rights. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We also review the trial court's finding regarding the children's best interests for clear error. See *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted). In its application of the clear-error standard, this Court gives

---

[1] *In re Hudson Minors*, unpublished order of the Court of Appeals, entered June 14, 2023 (Docket Nos. 366099 and 366374).

-1-

deference to the trial court's credibility determinations. *In re Schadler*, 315 Mich App 406, 408-409; 890 NW2d 676 (2016).

## II. RIGHT TO BE FREE FROM SELF-INCRIMINATION

Respondent-mother first contends that the trial court violated her right to be free from self-incrimination by making her choose between admitting guilt to witness tampering, MCL 750.122, and retaining her parental rights to her children.

The United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." US Const, Am V. Although this provision is incorporated to the states through the Fourteenth Amendment, *People v Cheatham*, 453 Mich 1, 9; 551 NW2d 355 (1996), this guarantee is also enshrined in the Michigan Constitution, Const 1963, art 1, § 17. This provision permits an individual to refuse to testify against herself in a criminal trial, and also grants her "privileges . . . not to answer official questions put to [her] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [her] in future criminal proceedings." *People v Wyngaard*, 462 Mich 659, 671-672; 614 NW2d 143 (2000) (quotation marks and citation omitted). A violation of the Fifth Amendment right against self-incrimination requires "compulsion, i.e., evidence that a person is unable to remain silent unless he chooses to speak in the unfettered exercise of his own will, that is grounded on a penalty exacted for a refusal to testify." *In re Blakeman*, 326 Mich App 318, 333-334; 926 NW2d 326 (2018) (quotation marks and citations omitted).

Respondent-mother misconstrues the record in her attempt to analogize this case to *In re Blakeman*. In that case, the respondent allegedly abused a toddler whom his wife was babysitting. *Id*. at 321. Child protective proceedings were initiated against the respondent, who was ordered to leave his family home, have no contact with his children, and started a case service plan in order to reunify with his family. *Id*. at 322-323. Following adjudication, the trial court repeatedly denied the requests for reunification because the respondent failed to accept responsibility for assaulting the toddler and would not let the respondent move back in with his children. *Id*. at 321. Outside of admitting guilt, the respondent was compliant with services throughout the case. *Id*. at 323. This Court held that requiring the respondent to confess to an act of criminal child abuse as a condition of reunification placed him in a "Hobbesian choice" violative of his Fifth Amendment right against self-incrimination. *Id*. at 334-335. In analogizing this case to hers, respondent-mother asserts that the trial court forced her to choose between incriminating herself in the upcoming proceeding for witness tampering and retaining her parental rights to LH and BH. This argument is not persuasive.

Respondent-mother was charged with, and ultimately convicted of, witness tampering in relation to her statements to CT that led CT to recant her sexual allegations against respondent-father. The trial court did not require respondent-mother to admit to this charge. Instead, the record shows that respondent-mother's case was initiated because she knew that respondent-father sexually abused CT and failed to protect her from that sexual abuse. Throughout the remainder of the proceedings, respondent-mother never reconciled with how her actions and these statements placed LH and BH in harm's way. In addition, at respondent-mother's adjudication, she pleaded to the entire petition, including the following paragraph:

On February 13, 2020, [respondent-mother] told Kent County Sheriff's Department Detective Michael Tanis that she did not tell [CT] to lie, but did tell [CT] that if [respondent-father] got in trouble for [CT's] disclosure the family would have to move, change schools, lose internet access, and not have any money. [Respondent-mother] also acknowledged that once the petition was withdrawn in December 2019, she stopped participating in her own YWCA therapy because it interfered with her work schedule.

Respondent-mother also pleaded that CT disclosed the sexual abuse to her previously and that she walked in on an instance of sexual abuse but did not take any action until October 2019, when CT disclosed abuse to her again.

As a result, the relevant issue in these proceedings was not whether respondent-mother told CT to lie about her allegations against respondent-father, but instead was whether respondent-mother understood the role that she played in the children coming into care. Plainly, respondent-mother pleaded that she did not lie, but she also admitted that she told CT that if respondent-father got in trouble for CT's sexual-abuse disclosure, the family would face negative consequences such as moving, changing schools, losing access to the Internet, and not having financial reserves. Despite these admissions, respondent-mother remained focused on her claims that she did not know about the abuse and that she never told CT to lie. Respondent-mother's insistent denials showed that she did not understand how her comments made CT feel and how respondent-mother's response to CT's sexual-abuse disclosure raised concern regarding her ability to safely parent LH and BH. This was the barrier that the agency and the trial court wanted respondent-mother to overcome to show that she could protect her children. The trial court's concern was not whether respondent-mother admitted to witness tampering, but that she understood how statements she admitted to making affected her ability to safely parent her children and show empathy toward them. This consideration did not require respondent-mother to forgo her right against self-incrimination and admit to witness tampering.

## III. STATUTORY GROUNDS

Next, respondent-mother argues the trial court clearly erred by finding that clear and convincing evidence supported that the alleged statutory grounds were met.[2]

The trial court terminated respondent-mother's parental rights to LH and BH pursuant to MCL 712A.19b(3)(b)(*ii*), (c)(*i*), (g), and (j). The trial court need only find that one statutory

---

[2] Because respondent-father does not challenge the statutory grounds for termination, we may presume that the trial court did not clearly err by finding that the unchallenged statutory grounds were established by clear and convincing evidence. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich at 353. Nonetheless, we are satisfied from our review of the record that the trial court did not clearly err when it found that each of the cited statutory grounds for termination of respondent-father's parental rights were established by clear and convincing evidence.

ground was established by clear and convincing evidence to terminate parental rights. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

Termination under MCL 712A.19b(3)(b)(*ii*) is appropriate when the

child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

\* \* \*

(*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

On appeal, respondent-mother asserts that grounds to terminate under MCL 712A.19b(3)(b)(*ii*) did not exist because CT originally recanted her allegations of sexual abuse without any prompting. Respondent-mother argues that she simply wanted to make sure that CT was telling the truth when she told CT that if respondent-father got in trouble for CT's disclosure, the family would face significant, negative consequences. The record does not support these arguments.

There was clear and convincing evidence to terminate respondent-mother's parental rights under MCL 712A.19b(3)(b)(*ii*). First, the record reflects that respondent-mother was aware of CT's sexual-abuse disclosures before October 2019 and did not act. Respondent-mother admitted that CT disclosed sexual abuse to her years before she took CT to the police. Additionally, a month before the October 2019 disclosure, respondent-mother walked in on respondent-father seated behind CT under a blanket. She pulled the blanket back and saw that CT's shorts and underpants were pulled down. Respondent-mother did not act after this incident. Instead, she waited until CT's October 2019 disclosure that respondent-father sexually abused her to go to the police. These facts show that respondent-mother had some awareness of respondent-father's behavior from at least a month to years before CT's October 2019 disclosure before she decided to act to protect CT.

Beyond not protecting CT from sexual abuse, the record shows that respondent-mother affirmatively acted to keep CT from alleging abuse against respondent-father after the October 2019 disclosure. CT disclosed respondent-father's sexual abuse at her first interview, but she recanted her claims at a second interview. The Department of Health and Human Services initiated a second petition after CT went to a third interview and restated her claims of sexual abuse and explained that she recanted after respondent-mother told her that if respondent-father got in trouble for CT's disclosure, the family would suffer negatively. Respondent-mother pleaded to each of these facts at her adjudication.

Respondent-mother never reconciled the inappropriateness of making these statements to CT after respondent-mother herself saw respondent-father's inappropriate conduct toward CT. Even on appeal, respondent-mother asserts that these statements were innocent. In contrast to respondent-mother's assertions on appeal, these facts demonstrated that respondent-mother was

unwilling to protect CT from sexual abuse. Throughout the three-year pendency of these proceedings, respondent-mother showed an inability to understand the sexual abuse that CT suffered and its effect on CT, and an inability to accept the role that she played in her children coming into the jurisdiction of the trial court.

Despite pleading to the earlier-stated facts, respondent-mother asserted throughout the proceedings that she was unaware of the abuse. She participated in therapy as part of her service plan. The agency sought for her to come to terms with the reason that her children came into care, but she was never able to accept her role in her failure to protect CT from sexual abuse and how that risk of harm extended to LH and BH. Instead, respondent-mother insisted that the only reason that LH and BH came into care was because of respondent-father's sexual abuse of CT. MCL 712A.19b(3)(b)(*ii*) expressly contemplates termination when the sibling of the child experienced sexual abuse, and as just accounted, evidence in the record established that respondent-mother's inability to accept her role in the sexual abuse of CT extended a risk of harm to LH and BH.

Respondent-mother oversimplifies the record when she asserts that CT's treatment did not relate to LH and BH, and that there was no direct risk of harm to LH and BH. There was clear and convincing evidence that respondent-mother had the opportunity to prevent the sexual abuse of CT and failed to do so. As such, a sibling of LH and BH suffered sexual abuse, and respondent-mother failed to prevent it. See MCL 712A.19b(3)(b)(*ii*). Further, she never reconciled her role in the danger that her children faced. Given this failure, the trial court did not clearly err when it determined that there was a reasonable likelihood that LH and BH would suffer injury or abuse in the foreseeable future if placed in respondent-mother's home.

Because we conclude that the trial court did not clearly err as to Subsection (3)(b)(*ii*), we need not address Subsections (3)(c)(*i*), (g) and (j). See *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012). However, after our review of the record, we affirm each of the additional grounds as well.

Respondent-mother also argues that her incarceration was used as an impermissible basis for termination. The record does not support this argument. "Incarceration alone is not a sufficient reason for termination of parental rights." *In re Mason*, 486 Mich 142, 146; 782 NW2d 747 (2010). However, the trial court did not consider respondent-mother's incarceration as grounds for termination. Instead, in relation to the reasonableness of continuing the proceedings under MCL 712A.19b(3)(c)(*i*), the trial court determined that after respondent-mother was released from incarceration, she would require an additional year of services in addition to the three years that she already received to overcome her barriers. Accordingly, the trial court did not premise termination on respondent-mother's incarceration in contravention of *In re Mason*, but instead on the fact that respondent-mother would need an additional year of services to overcome her barriers.

IV. BEST INTERESTS

Both respondents argue that the trial court erred when it determined that termination was in the best interests of the children.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*,

297 Mich App at 40, citing MCL 712A.19b(5). "[T]he focus at the best-interest stage" is on the children, not the parent. *In re Moss*, 301 Mich App at 87. The trial court should weigh all the evidence available on the record to determine the children's best interests. *In re Trejo*, 462 Mich at 356-357. The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other considerations include the length of time that the children were in foster care or placed with relatives; the likelihood that "the child could be returned to her parents' home within the foreseeable future, if at all"; and compliance with the service plan. *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). Further, the trial court must "consider the best interests of each child individually and . . . explicitly address each child's placement with relatives at the time of the termination hearing if applicable . . . ." *In re Olive/Metts*, 297 Mich App at 44.

On appeal, respondent-mother asserts that the record indicated that she had a strong bond with LH and BH, and that the trial court's best-interest analysis only pertained to "generalities." Instead, she notes that because a protective order kept respondent-father away from LH and BH, there was no basis for finding that the children's best interests supported termination. This argument is likewise not supported by the record.

First, respondent-mother's assertion that she had a strong bond with LH and BH is not supported by the record. Instead, the trial court's finding that LH had no bond with respondent-mother and that BH had a very low bond with respondent-mother was supported by the record. At the time of the termination hearing, the children no longer wanted to see respondent-mother. LH in particular did not want to attend parenting time, and when respondent-mother still had parenting time, a rule had to be implemented that she not engage in physical affection with LH. BH also expressed that she no longer wanted to attend parenting time, but her disinterest could be accredited in part to mimicking LH. Both children were excited when they were informed that they no longer had to attend parenting time. The children's lack of affection with respondent-mother was contrasted with their "very, very strong bond" with their foster family whom they had lived with for $2^1/_2$ years at that point. This record supported the trial court's determination that both LH and BH had little, if any, bond with respondent-mother.

Second, respondent-mother's argument that the trial court erroneously attributed the reduction in LH's self-harming behavior to respondent-mother's parenting time ceasing, as opposed to his participation in therapy, is unavailing. The connection between the reduction in LH's self-harming behavior and respondent-mother's parenting time ceasing was supported by the record. A caseworker testified that LH's self-harming behaviors, such as hitting and scratching himself, occurred during parenting time and in the time surrounding parenting time. LH frequently expressed that he did not desire to attend parenting time. These behaviors decreased significantly after respondent-mother's parenting time ceased. Respondent-mother's argument that the reduction in this behavior was *only* attributable to LH's participation in therapy ignores that LH's self-harming behavior was centralized around the time that he was required to spend with respondent-mother. Accordingly, we are not left with a definite and firm conviction that the trial court made a mistake when it attributed the reduction in LH's self-harming behavior to the end of respondent-mother's parenting time. See *In re Moss*, 301 Mich App at 80.

The trial court also considered more than just generalities in its analysis of the best-interest factors and respondent-mother's parenting skills. In its analysis of respondent-mother's parenting ability, the trial court determined that respondent-mother's parenting skills were "at the lowest level" and explained that respondent-mother was "centered on herself." This determination was supported by the record. At the time of termination, respondent-mother's parenting time was suspended because of statements that respondent-mother made about escaping with her family to Mexico. LH had emotional outbursts potentially connected to his allegations of sexual abuse against respondent-mother and his desire not to see respondent-mother. When parenting time occurred, respondent-mother could not address LH's emotional outbursts. Instead of addressing the behavior, respondent-mother distracted LH with toys and candy or let him destroy items in the room. Respondent-mother would take BH into her room and close the door when LH had emotional outbursts.

After parenting time was suspended, respondent-mother prioritized her own feelings over LH's and BH's well-being. She stopped asking how LH and BH were doing because it hurt her feelings to hear about them. In addition to prioritizing her feelings over inquiring into LH's and BH's well-being, as we have recounted, respondent-mother showed that she was unable to empathize with her children. This record supported the trial court's determination that respondent-mother's parenting skills were low and that respondent-mother centered her own feelings over the well-being of her children.

Next, the trial court determined that the children's need for permanency, stability, and finality supported termination. LH and BH came into care three years earlier, when they were very young. At the time of termination, both LH and BH were still young, aged eight and five, but had lived with their preadoptive foster family for $2^{1}/_{2}$ years. Given respondent-mother's inability to benefit from services, the children would need to wait at least another year for respondent-mother to benefit from her service plan.

Finally, the trial court determined that the children's foster home was more advantageous than respondent-mother's home. The record also supported this finding. LH and BH were placed in the same pre-adoptive foster home for the majority of these proceedings, and the home was safe and appropriate. LH and BH had a strong bond with their foster family, and both were up to date on their medical needs. LH, in particular, participated in services for his mental-health needs. LH and BH's foster parents advocated for their needs. In contrast, after respondent-mother's parenting time was suspended, LH's self-harm behavior decreased significantly, and both children revealed more positive attitudes. Given this record, the trial court's determination that the children's foster home was more advantageous than respondent-mother's home was not erroneous.

In sum, the trial court engaged in an analysis of each of the relevant factors and supported its findings with more than mere generalities. The trial court's best-interest determination on the record does not leave a "definite and firm conviction that a mistake has been committed . . . ." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

Finally, the trial court determined that the best-interest factors supported terminating respondent-father's parental rights. Respondent-father does not contest most of the trial court's best-interest determinations on appeal. Instead, respondent-father argues that the testimony indicated that he had excellent parenting abilities and that this factor weighed against termination.

Additionally, respondent-father begrudged the trial court's decision early in these proceedings to remove LH and BH from a relative placement. Respondent-father asserts that, had LH and BH been placed with a relative, this factor would have weighed against termination of his parental rights. We find neither argument persuasive.

First, as to the relative-placement, at the time of the termination hearing LH and BH had lived in a foster placement for $2^1/_2$ years. At the outset of this case in 2020, LH and BH were placed with respondent-father's sister. The trial court removed LH and BH from the sister's home in May 2020, after the caseworker testified that the sister had a good relationship with respondent-father and could not answer whether the sister was in contact with respondent-father. The caseworker further testified that the father's cousin, who lived with respondent-father, was the children's primary care provider or babysitter. The trial court found that the placement was not supportive of CT, who would not be able to visit with her siblings.

Throughout the proceedings, several paternal relatives applied for relative placements, including respondent-father's other sister, JH, and respondent-father's parents. JH was approved for placement. Respondent-father's parents were only interested in respite care. At a hearing held in October 2022, the trial court did not remove the children from foster care and place them in JH's home because it determined that it was in the children's best interests to remain in their current foster placement. The trial court explained that no inquiry was made into JH's beliefs regarding respondent-father's sexual abuse of CT.

Respondent-father does not directly assert that the trial court erred when it did not move LH and BH into JH's home. Instead, he simply argues that, had the trial court followed the recommendation of the foster-care agency, the children would have been placed with a fit and willing relative and that this factor would weigh against termination. In support of this assertion, respondent-father asks this Court to extend the logic of *In re Mason*.

As stated in *In re Mason*, relative placement is an explicit factor in the best-interest analysis when the children are in a relative placement. *In re Mason*, 486 Mich at 164. However, relative placement does not preclude termination of parental rights. See *id*. "[T]he trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Olive/Metts*, 297 Mich App at 43.

The trial court was not obliged to follow the recommendation of the foster agency. The record reflected that the best interests of the children were served by remaining in their foster-care placement. LH and BH were in their foster placement for $2^1/_2$ years at the time of the termination hearing. A caseworker reported that both children had a strong bond with their foster parents and siblings. The children's mental and physical needs were met in their foster placement. LH and BH were reported to be doing very well in their placement.

In contrast, the paternal grandparents were only interested in respite care. Removal of the children from a home that offered them permanency, stability, and finality to a temporary placement would unnecessarily uproot LH and BH. Likewise, placement in JH's home was not in LH's and BH's best interests. LH received mental-health treatment for post-traumatic stress disorder in his foster placement. Uprooting LH and BH from their home of $2^1/_2$ years did not serve their best interests. Further, at the termination hearing, JH reflected an unwillingness to accept

that respondent-father committed the actions for which he was convicted.  In sum, the trial court did not err when it did not place LH and BH in relative care and did not err when it did not consider relative placement in its best-interest analysis

With respect to the trial court's analysis of the best-interest factors, respondent-father only challenges the trial court's determination that respondent-father had poor parenting abilities.  The trial court discounted the testimony from JH and respondent-father's father, who testified that respondent-father had superior parenting abilities.  Instead, the trial court assessed respondent-father's parenting ability as "poor to despicable" in light of his convictions for sexually abusing a nine-year-old girl.  The record supported this determination, and we give deference to the trial court's credibility determinations.  *In re Schadler*, 315 Mich App at 408-409.  The trial court also determined that the children's bond with respondent-father; respondent-father's parenting ability; the children's need for permanency, stability, and finality; the advantages of a foster home over respondent-father's home; and the unique needs of LH all favored termination.  Our review of the record regarding these factors does not leave a "definite and firm conviction that a mistake has been committed . . . ." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

Affirmed.

/s/ Noah P. Hood
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado