# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BLAKEMAN, Minors.

FOR PUBLICATION
October 25, 2018
9:00 a.m.

No. 341826
Ingham Circuit Court
Family Division
LC Nos. 17-000250-NA;
          17-000251-NA;
          17-000252-NA;
          17-000253-NA

Before: BECKERING, P.J., and RIORDAN and CAMERON, JJ.

CAMERON, J.

In this interlocutory appeal from a child protection hearing, respondent-father appeals[1] a dispositional order that prohibits him from residing in the family home with his wife and four children. Respondent came under the jurisdiction of the court for assaulting an unrelated toddler for whom his wife was babysitting. After respondent completed court-ordered services, petitioner, the Department of Health and Human Services (DHHS), had recommended to the trial court over the course of a year that respondent be allowed to return to the home. The assistant prosecuting attorney (APA) representing DHHS disagreed and urged the trial court to continue only supervised visitation. The trial court repeatedly denied DHHS' requests for reunification, concluding that respondent's failure to accept responsibility for assaulting the toddler precluded him from returning to the family home and having unsupervised visitation with his children. On appeal, respondent argues the trial court violated his Fifth Amendment right against self-incrimination when it conditioned reunification on respondent's admission to abusing an unrelated toddler. We agree that the trial court committed error and, therefore, vacate and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

---

[1] See *In re Blakeman*, unpublished order of the Court of Appeals, entered February 7, 2018 (Docket No. 341826).

Respondent and his wife have four children. On occasion, respondent's wife would babysit an unrelated toddler. In November 2016, the toddler suffered a seizure, and thereafter, often screamed and cried while he was in respondent's home. On February 9, 2017, respondent's wife was babysitting the toddler. Late in the afternoon, respondent's wife left to pick up food for dinner, leaving the toddler with respondent. When respondent's wife returned, the toddler was unresponsive. Respondent's wife called 911, and the emergency responders believed the toddler suffered a seizure. The toddler was transported to the hospital where the physicians discovered a large, life-threatening skull fracture. The physicians determined the fracture was non-accidental and occurred close to the time the toddler was admitted to the hospital. The toddler survived the fracture, but his physician expects significant long-term physical and cognitive deficits.

The day after the toddler was taken to the hospital, DHHS filed a child protective petition against both respondent and his wife. The trial court authorized the petition but allowed the four children to stay with their parents in the home. However, after a custody review hearing, the trial court removed the children from the family home and authorized supervised parenting time. The parents then requested an additional custody review hearing. The trial court held the additional custody review hearing and released the children to the parents.

DHHS filed a second, final amended petition on April 7, 2017. DHHS did not seek termination of petitioner's parental rights, and instead requested that the children be temporarily removed from the home.

In June 2017, the trial court held a multi-day adjudicative bench trial. At the trial, respondent was informed of his right against self-incrimination, but he chose to waive that right and testified. Respondent maintained his innocence throughout the examination, claiming he did not know how the toddler sustained the skull fracture. At the close of the trial, the trial court found that respondent fractured the toddler's skull, concluded that the court had jurisdiction over the children, and ordered respondent to leave the family home and have no contact with his children other than supervised visits. As to respondent's wife, the trial court found that she was not responsible for the toddler's injuries and was thus a nonrespondent.

Respondent then began a court-ordered service plan designed to address his issues and to allow him to move back into the family home and have unsupervised visitation with his children. In late June 2017, respondent began weekly counseling sessions with a therapist. Shortly thereafter, he had a psychological evaluation. The evaluator noted that respondent may have passive-aggressive traits and other related traits such as "a pattern of passive resistance, opposition, stubbornness, failure to engage in direct communication, blaming others, feigning compliance, and a negative disposition." The evaluator stated that there was no information to assess whether respondent had fractured the toddler's skull, but noted that there were no reports that he had ever abused his own children. The evaluator concluded, "[t]his clinician cannot reflect on any compelling reasons why [respondent] should not be able to return home."

In July 2017, a dispositional review hearing was held, and a DHHS foster care worker updated the trial court on respondent's progress. According to her, the only barriers to respondent's return to the family home was the completion of court-ordered services. By this time, respondent had already completed a psychological evaluation, a counselor had been

assigned, and respondent was scheduled to begin trauma-based therapy, a parenting class, and he was made aware that additional services could be added depending on the results of his psychological evaluation. The parties all agreed, including the APA, that respondent "appear[ed] to be off to a compliant start." However, before setting the date for the next dispositional hearing, the trial court expressed doubt that the outstanding psychological report, or any other evidence for that matter, could support reunification:

> I don't know a good way forward, quite honestly, because the findings that I was required to make by the evidence that was presented was that, [respondent] brutally beat another child. . . . So, it's going to take a lot for me to be convinced that he ought to have any unsupervised time with his children, or any other children, quite honestly, because of the nature of the beating, and what occurred to this other boy. . . . And so - and I don't know what treat - I don't know what treatment there is.

In September 2017, DHHS submitted a written report to the trial court to be considered before the next dispositional review hearing. In the report, DHHS indicated that respondent and his wife had been cooperative and that their four children were doing well, although some of the children were having adjustment issues relating to respondent's removal from the family home. The supervisor of the parental visits reported no concerns and indicated that respondent was "fully engaged and interacts well with the children." DHHS recommended that the trial court maintain jurisdiction and that respondent be permitted to return to reside in the family home without supervised visitation.

In October 2017, the trial court held another dispositional review hearing. Beforehand, DHHS provided the trial court with an updated dispositional review report, stating that there were no safety concerns during respondent's supervised visits with his children, and he had "exhibited positive communication, appropriate discipline techniques, and positive parenting techniques." DHHS reiterated its recommendation that respondent be allowed to return to the family home. Respondent's court-ordered therapist, Cynthia Swartz, also submitted a letter to the trial court affirming respondent's progress and explaining that his primary diagnosis is Adjustment Disorder. She stated that respondent had been cooperative and concluded her letter stating, "In summary, I would echo [the psychological evaluator's] recommendation by saying that I can find no compelling reason why [respondent] should not be able to return home; and in fact, suggest that his absence has become a hardship for his family."

At the October 2017 dispositional review hearing, the DHHS foster care worker reiterated that there were no concerns about respondent returning to his family while continuing his private counseling. After testimony concluded, the APA stated he was "[not] comfortable endorsing the suggestion of foster care, that -- that dad go home at this time" because he was concerned that the severity of the toddler's injuries, coupled with the psychological report, raised "a lot of red flags," and he was not convinced that Swartz considered the psychological report as part of her written recommendation to the trial court. Respondent's attorney responded that his client had complied with all court ordered services and that he was "not sure what else we need to do to get [respondent] back in the home." The trial court rejected DHHS' reunification recommendation, and expressed dissatisfaction "with how this has been overseen by the [DHHS] caseworker." The trial court ordered respondent's therapist to appear at the next dispositional

review hearing to explain her conclusions and recommendation. Further, the trial court expressed disbelief that the therapist and DHHS were recommending reunification when respondent had not even admitted to his therapist that he assaulted the toddler:

> And, you know, ten therapy sessions later, don't [sic] change the fact -- especially in the a [sic] situation where this -- the -- the father is not, he's not taking any responsibility for any of this. Matter of fact, it's everybody else's fault. It's not his fault. So how do you change your behavior? *How do you have insight without any acknowledgement that you did anything wrong*? . . . Ten therapy sessions have done no good. There's no more insight. [Emphasis added.]

The trial court then questioned whether the therapist even considered how respondent's claim of innocence might interfere with respondent's therapy: "There's no indication the therapist had analyzed anything in terms of his responses to the types of things there [sic] working on. Whether he's taking accountability, responsibility, and he knows what things and tools he needs to do to change his behavior." The trial court concluded the hearing, stating: "The fact[] in this case is that [respondent] fractured the skull of a young, special needs child. And he's staying out of the house because I'm not having him do that again."

At the December 2017 dispositional review hearing, Swartz and the DHHS foster care worker defended their recommendation to allow respondent's return to the family home. The APA challenged both Swartz and the DHHS worker regarding their recommendations. The DHHS worker acknowledged to the court that the toddler's injuries were serious and that the trial court had concluded that respondent was found legally responsible for those injuries. She further acknowledged that respondent had not admitted to injuring the toddler. The APA then questioned the DHHS worker as to how she could recommend respondent's return to the family home under those circumstances. The DHHS worker explained that respondent was working toward addressing any anger, parenting, or other underlying issues, and neither DHHS nor Swartz had identified any safety concerns that should prevent respondent from returning home and continuing DHHS services.

During the APA's brief cross-examination, Swartz also was pressed about whether respondent had made any admissions during his therapy sessions and how she could conclude that respondent was benefiting from counseling if "we haven't identified that he did anything wrong." Like the DHHS worker, Swartz acknowledged that respondent had not admitted responsibility for the toddler's injuries. The trial court then interrupted questioning and the following exchange occurred:

> *Court*: Generally when I benefit from therapy it's because I recognize that there's something that I've done wrong or something that I'm not doing appropriately or something that I need to improve upon and then I focus on those things and I act accordingly and change my behavior. Is that the purpose of therapy?

> *Swartz*: Sure. I would say how to handle things in life that are not going the way you maybe expected that they would go.

*Court*: Right, like a kid crying all day.

*Swartz*: Sure.

*Court*: All right. The outcome for him under this court's ruling on medical information, trial that I held, indicates that he handled that in a brief moment in time by giving this kid a skull fracture. How that happened I don't know. I just know that he did it, that's what I conclude, all right? So, given that reality . . . , without acknowledging your responsibility for that behavior, how are you going to avoid engaging in that behavior in the future if you don't acknowledge that you did something wrong?

*Swartz*: Do you want me to give you my hypothesis on this? . . . [W]e have not talked about [the toddler]. So, what I have observed however is deep empathy and understanding love, engagement with his own children and, you know, a desire to be a good parent for them. So, I feel like that, along with the history of his parenting with his children is an indication that he would continue in that way.

*Court*: I find it to be rather shocking, quite honestly, that [the toddler] hasn't been talked about.

*Swartz*: We've talked about it in the terms of his-he claims that that was not the case and, you know, if you like excuses but you were wrong in that-

*Court*: Right.

*Swartz*: -so, yeah, and there is empathy for the injury for [the toddler] but no . . . admission that he did it. I've been doing it long enough that I feel like our relationship is good enough that if there was an admission to that, he would have said that to me but . . . I'm not a mind reader and I can't say whatever but-so I think from his perspective . . . the frustration is having been accused of something that he didn't do and how do you deal with that . . . and show that he is a good parent and be trusted with his children.

At the close of the hearing, the children's lawyer-guardian ad litem stated that she had changed her position and that respondent should not return to the home. The APA, despite the DHHS recommendation, also argued that respondent should not be allowed to return home. In response, respondent's counsel argued that the trial court should allow respondent to return home and raised the following concern:

[I]t's problematic to be asking a parent to incriminate himself in order to allow him to get his kids back in his care because then we're just inviting I guess

criminal charges. So . . . I think that's a legal issue and certainly [respondent] at least would not be advised by me to make such an admission, at least at this point in time.

The trial court then summarized its ruling as follows:

I didn't sit through a trial for no reason. I didn't make these findings for no reason. I haven't heard anything that would change the court's conclusion. . . . [W]hether or not your client has legal implications from addressing what I consider him to be in denial about-that's of no import to me. It doesn't matter to me whether you, you know, parents come to court many times and say your Honor I'm going to assert my [F]ifth [A]mendment rights against self-incrimination because I don't want to testify because, ah, I'm under threat of criminal prosecution. Well, that's a choice. In that instance you've chosen your liberty interest over your children's. That's a choice that parents make. . . . So, again, I hate to be the, you know, the immovable object but I concluded that based on his injuries and based upon the window of time that this child was at in [respondent's] care, that that injury occurred while the child was in his care alone. I came to that conclusion, that's a finding. *The therapist doesn't trust my finding apparently based upon the work she's had with him. [Respondent] doesn't believe-he denies that that happened, I found that it did. And to go on like as if nothing happened, I am absolutely astounded that the state would take that position. . . . Why file this petition in the first instance? I am astounded that the State of Michigan has taken that position.* Well, you know, he seems like a good dad to me, we just let him back in the house and, you know, he's had a psychological evaluation, he's talked to a therapist for a while and yeah, you might have found that he crushed this kid, broke this kid's skull but there's, you know, he's not-that's neither here nor there, we're just going to proceed according[ly].

[N]othing has changed**.** He and his therapist are not even talking about [the toddler]. It's not even coming up in discussion. So we're living in this other world where he didn't do anything wrong and he's just trying to be a better dad and husband.

* * *

So my reality is much different than everybody else's reality except for [the prosecutor] and now [the LGAL]. Everyone's reality is different than mine but these children are my court wards. . . . [S]omehow the [c]ourt has gotten it wrong and . . . he's been able to convince everybody that he's a good guy and the kids miss him, we're just going to forget about [the toddler] and what he did to him. That's not how it works, folk[s].

So, I have to make decisions based upon my reality, the reality of this case. The reality of this case is that [respondent] had a frustration, anger, whatever it is that was working, he caused a skull fracture to the young man who

-6-

had to be rushed to the hospital. . . . So, the Court made that finding. [N]othing I heard today pushes the ball forward. I'm affirming the prior orders.

* * *

Unless something changes, I can't tell you that I'm going to change. [Emphasis added.]

The trial court entered its order following the dispositional review hearing, continuing its directive that respondent not live in the home and only have supervised contact with the children.[2]

On appeal, we must answer a constitutional question of first impression, which is whether a parent's constitutional right against compelled self-incrimination bars a court in child protection proceedings from requiring that parent, as a condition of reunification, to admit to having abused an unrelated child. We conclude that it does, and therefore, vacation and remand is required.

## II. STANDARD OF REVIEW

Dispositional orders entered after a court assumes jurisdiction over a child "are afforded considerable deference on appellate review." *In re Sanders*, 495 Mich 394, 406; 852 NW2d 524 (2014). A trial court's dispositional order is reviewed for clear error. *Id*. This Court reviews constitutional questions de novo. *In re AMAC*, 269 Mich App 533, 535; 711 NW2d 426 (2006);

---

[2] Since the filing of this interlocutory appeal, the APA and trial court have relied on respondent's failure to admit guilt as evidence that respondent could not have made progress toward reunification as DHHS has reported. Indeed, the APA recently asked DHHS, "Why are we giving [respondent] services if he hasn't recognized that he has an anger problem?" Further, because respondent had not made a "breakthrough" in acknowledging his abuse of the toddler, the APA has opined that the case would likely result in the "permanent wardship" of the children. In these same hearings the trial court's justification for continuing only supervised visitation was that "additional counseling is required to address the acceptance of responsibility for the behavior that led to the injury to the minor child . . . in order for [respondent] to fully benefit from the services that are being provided to him."

At the most recent dispositional review hearing in August 2018, the DHHS worker informed the trial court that respondent completed all services, and therefore, unsupervised parenting time was recommended. At the conclusion of the hearing, the APA again argued against unsupervised parenting time, stating that "our only options are a full custody order in mom, a release of parental rights by dad[,] or termination of parental rights by dad." The trial court scheduled another dispositional review hearing date, stating: "I disagree with the assessment of the case. . . . I'm not satisfied based on what's been reported to the [c]ourt. I [don't have] any degree of confidence in [respondent's] ability to provide care without supervision." No further services have been recommended for respondent.

-7-

*People v Conat*, 238 Mich App 134, 144; 605 NW2d 49 (1999). Similarly, "[w]hether a party has been afforded due process is a question of law, subject to review de novo." *In re Contempt of Henry*, 282 Mich App 656, 668; 765 NW2d 44 (2009).

III. ANALYSIS

Respondent argues that, by requiring him to confess to an act of criminal child abuse as a condition of reunification with his children, the trial court violated his Fifth Amendment right against compelled self-incrimination. We agree.

The rights recognized by the Fifth Amendment of the United State Constitution include the guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." US Const, Am V. This provision applies to the states through operation of the Fourteenth Amendment, *People v Cheatham*, 453 Mich 1, 9; 551 NW2d 355 (1996) (BOYLE, J.), citing *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964), and appears verbatim in the Michigan Constitution. Const 1963, art 1, § 17.

The constitutional protection is worded as one applicable to criminal cases, and thus it applies in any situation where a criminal prosecution might follow, regardless of how likely or unlikely such additional machinations may seem. See *United States v Miranti*, 253 F2d 135, 139 (CA 2, 1958) ("We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute."). Accordingly, "[t]he privilege can be claimed in *any proceeding*, be it criminal or civil, administrative or judicial, investigatory or adjudicatory." *People v Ferency*, 133 Mich App 526, 533; 351 NW2d 225 (1984), retaining italics and quoting *In re Gault*, 387 US 1, 47; 87 S Ct 1428; 18 L Ed 2d 527 (1967) (quotation marks and citation omitted). Any testimony "having even a possible tendency to incriminate is protected against compelled disclosure." *People v Lawton*, 196 Mich App 341, 346; 492 NW2d 810 (1992). The privilege may be invoked even when criminal proceedings have not been instituted or even planned. *People v Guy*, 121 Mich App 592, 609-619; 329 NW2d 435 (1982). Here, although respondent has not been charged for assaulting the toddler, we can reasonably conclude that an inculpatory statement by respondent could be used in the future by the Ingham County prosecutor, and therefore, respondent is afforded the protections under the Fifth Amendment throughout the child protection proceedings.

We acknowledge that the trial court did not demand a confession from respondent, but it instead refused to allow respondent an opportunity to return to the family home if he did not admit responsibility for the toddler's injuries to his therapist as part of his services. Any such admission to his therapist would not be privileged against disclosure in this child protection proceeding. See MCL 722.631 (abrogating privileges in communications other than those between attorney and client, or priest and penitent, in child protection proceedings).

The privilege against self-incrimination permits a defendant to refuse to answer official questions in any other proceeding, no matter how formal or informal, if the answer may incriminate him in future criminal proceedings. *Philips v Deihm*, 213 Mich App 389, 399-400; 541 NW2d 566 (1995). Our courts have seldom addressed the Fifth Amendment right against self-incrimination in the context of child protective proceedings. In *In re Stricklin*, 148 Mich

App 659, 662-663; 384 NW2d 833 (1986),[3] the parents argued that the trial court violated their rights against compelled self-incrimination when it refused to adjourn the child protection proceedings pending the outcome of the criminal proceedings against them. *Id*. In that case, this Court recognized two interrelated requirements for a Fifth Amendment violation: compulsion, i.e., evidence that "a person is unable 'to remain silent unless he chooses to speak in the unfettered exercise of his own will,' " that is grounded on a penalty exacted for appellants' refusal to testify. *Id*. at 663-664. The question in *In re Stricklin* was "whether a penalty was exacted for appellants' refusal to testify [at the child protection proceedings], sufficient to amount to the kind of compulsion contemplated by the Fifth Amendment." *Id*. at 664. According to the appellants, "compulsion was present in the case at bar because the specter of losing their parental rights was held over their heads if they chose not to testify." *Id*.[4] This Court disagreed, noting that for "a Fifth Amendment violation, the testimony offered at the criminal proceeding would have had to have been incriminating." *Id*. However, any testimony proffered at a proceeding in the child protection case would have been "nonincriminating," and therefore, "the choice not to testify was no more than appellants' tactical decision as to the best course to follow through the probate and criminal proceedings." *Id*. at 666.

Here, unlike in *In re Stricklin*, respondent waived his Fifth Amendment right against self-incrimination at the adjudicative bench trial. He provided "nonincriminating" testimony, claiming he did not injure the toddler and believed that any injury resulted from a seizure. At the close of trial, the trial court found by a preponderance of the evidence that respondent caused the injuries to the toddler. At a later dispositional review hearing, the trial court gave respondent a Hobbesian choice to either (1) retract his claim of innocence, admit to the child abuse at therapy as a condition of completing services, and expose himself to criminal liability for child abuse, or (2) maintain his innocence, which would likely result in the termination of his parental rights to his four children. Even though respondent initially waived his Fifth Amendment right to remain silent,[5] there was a sufficient showing of compulsion at the dispositional review hearing. "The compulsion of *nonincriminating* testimony is not the sort of compulsion contemplated by the Fifth Amendment." *Id*. at 665 (emphasis added). The trial court, however, conditioned

---

[3] We acknowledge that Court of Appeals decisions before November 1, 1990 are not binding. MCR 7.215(J)(1). However, *In re Stricklin* has not been overruled or modified, and we see no reason to depart from it now.

[4] Importantly, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the amendment does not preclude the inference where the privilege is claimed by a party to a civil cause." *Phillips v Deihm*, 213 Mich App 389, 400; 541 NW2d 566 (1995), citing *Baxter v Palmigiano*, 425 US 308, 318; 96 S Ct 1551; 47 L Ed 2d 810 (1976).

[5] Voluntary testimony given in one proceeding does not constitute a waiver of the Fifth Amendment privilege against self-incrimination in a subsequent proceeding. See *People v Hunley*, 63 Mich App 97, 101; 234 NW2d 169 (1975) (stating that a "[d]efendant's decision to testify at the preliminary examination does not prevent the defendant from asserting his Fifth Amendment right not to testify at trial") (quotation marks and citation omitted).

reunification on an admission of guilt to the child abuse. We see no reason to conclude that there is a lack of compulsion simply because respondent initially waived his Fifth Amendment right, testified at the trial, and was then later compelled to retract his claim of innocence and incriminate himself. Compulsion occurs "when a person is unable 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " *Id*. at 664. As the trial court explained, he had a choice to choose between his liberty interests or his children. Respondent chose the former, but any right to remain silent was no longer unfettered, and there was sufficient compulsion "to be a witness against himself." US Const, Am V.

Turning to the second *Stricklin* requirement, there must be a penalty exacted on respondent for refusing to admit to the crime sufficient to compel self-incrimination. In this case, that penalty was obvious. Because respondent would not incriminate himself and admit to the child abuse, he was ordered to remain outside the family home, was granted only supervised visiting time, and was informed by the government that he most likely faces the future termination of his parental rights to his four children. Therefore, unlike *In re Stricklin*, respondent was given an extreme and detrimental choice—admit to the child abuse at therapy, which could be used in future criminal proceedings—or continue to be separated from his children and eventually lose his parental rights. This was a severe penalty threatened, and therefore, a violation of respondent's Fifth Amendment right against compelled self-incrimination.

The circumstances underlying the instant case square with the plurality decision in *McKune v Lile*, 536 US 24; 122 S Ct 2017; 153 L Ed 2d 47 (2002). In *McKune*, the United States Supreme Court decided whether participation in Kansas' Sex Abuse Treatment Program (SATP) violated an inmate's right against compelled self-incrimination. *Id*. at 29-30.

> As part of the program, participating inmates are required to complete and sign an "Admission of Responsibility" form, in which they discuss and accept responsibility for the crime for which they have been sentenced. Participating inmates also are required to complete a sexual history form, which details all prior sexual activities, regardless of whether such activities constitute uncharged criminal offenses. A polygraph examination is used to verify the accuracy and completeness of the offender's sexual history. [*Id*. at 30.]

The Court acknowledged that any information provided as part of SATP was not privileged and would "leave[] open the possibility that new evidence might be used against sex offenders in future criminal proceedings." *Id*. Choosing not to participate in the program automatically resulted in the reduction of "privilege status," which included a reduction in "visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television," and "transfer[] to a maximum-security unit." *Id*. at 30-31.

The defendant refused to participate in the program and filed an action, claiming that the requirements of the SATP violated his Fifth Amendment right against compelled self-incrimination. *Id*. at 29. The issue before the United States Supreme Court was "whether the State's program, and the consequences for nonparticipation in it, combine to create a compulsion that encumbers the constitutional right." *Id*. at 35. With a showing of compulsion, Kansas could no longer "continue the program in its present form." *Id*. The Court in *McKune*, however,

-10-

determined that "[t]he consequences in question . . . are not ones that compel a prisoner to speak about his past crimes despite a desire to remain silent." *Id*. at 36. The consequences in this case—a loss of one's constitutional right to provide care to his children—is far greater than the consequences that the defendant faced in *McKune*.

Our Supreme Court and the United States Supreme Court have found that a constitutional violation arises when a person is subject to a severe consequence unless they waive their Fifth Amendment right against compelled self-incrimination. A concurrence in *State Bar Grievance Administrator v Baun*, 395 Mich 28, 42 n 9; 232 NW2d 621 (1975), noted that "[t]he United States Supreme Court has limited the collateral consequences or penalties which may be imposed on the [one] claiming the privilege" against self-incrimination. *Id.* at 41 n 9 (LEVIN, J., concurring), citing *Lefkowitz v Turley*, 414 US 70; 94 S Ct 316; 38 L Ed 2d 274 (1973), and *Slochower v Bd of Higher Ed*, 350 US 551; 76 S Ct 637; 100 L Ed 692 (1956). In *Lefkowitz*, the state "sought to interrogate [the] appellees about their transactions with the State and to require them to furnish possibly incriminating testimony by demanding that they waive their [Fifth Amendment] immunity and by disqualifying them as public contractors when they refused." *Lefkowitz*, 414 US at 82. The United States Supreme Court disapproved of that tactic, holding that "[a] waiver secured under threat of substantial economic sanction cannot be termed voluntary." *Id.* at 82-83. In *Slochower*, the Court disapproved, on due process grounds, of a provision of the Charter of the City of New York that arbitrarily conditioned continued municipal employment on employees waiving their right against self-incrimination whenever asked a question relating to official conduct. *Id.* at 552, 556, 559. As part of its reasoning, the Court noted that "a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing," and thus that the right against self-incrimination "serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Id.* at 557-558. In *Spevack v Klein*, 385 US 511, 516; 87 S Ct 625; 17 L Ed 2d 574 (1967), the Court held that "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege."

Threatened termination of one's parental rights presents an imperative at least as great as continued municipal employment, eligibility for public contracting, and the threat of disbarment, and if the latter may not be used to condition the waiver of one's right against self-incrimination, neither should one's parental rights. By requiring respondent to confess to the criminal abuse of the toddler in order to regain care and custody of his children, the trial court was requiring an inculpatory admission against respondent's penal interests. This could also be self-defeating because such an admission may lead to criminal charges that end with him being taken away from his children due to incarceration. This practice offends due process when a respondent is required, on pain of being deprived of the care and custody of his children, to confirm the trial court's determination that he had committed severe child abuse. Even more, requiring respondent to admit to the child abuse after he had already testified at trial and denied any wrongdoing would subject him to possible perjury charges. The record clearly shows that the trial court violated respondent's Fifth Amendment right against self-incrimination when it conditioned unsupervised visitation and eventual reunification on respondent's admission to the child abuse.

With that said, this Court has the difficult task of providing guidance to the trial court in light of this constitutional violation. "[A]t each review hearing, the court is required to consider, among other things, '[c]ompliance with the case service plan with respect to services provided or offered to the child and the child's parent, . . . whether the parent . . . has complied with and benefited from those services,' and '[t]he extent to which the parent complied with each provision of the case service plan, prior court orders, and an agreement between the parent and the agency.' " *In re Mason*, 486 Mich 142, 156; 782 NW2d 747 (2010), quoting MCL 712A.19(6)(a) and (c). Under MCL 712A.19(6)(d), the trial court must also take into account the likely harm to the children if they continue to be separated from respondent, as well as the likely harm to the children if they are returned to their parent's care, MCL 712A.19(6)(e). We remand this case to the trial court for a balancing of imperatives, instructing the trial court to decide anew the questions of visitation and whether to allow respondent to return to his family home, taking into consideration all the facts and circumstances while refraining from considering respondent's persistent claim of innocence in connection with the toddler. In doing so, the trial court must ensure that it is complying fully with the requirements of MCL 712A.19(6).[6]

---

[6] While not raised on appeal, we believe it is important for the trial court to address whether the prosecutor has standing to proceed in this case. There are three avenues in which a county prosecutor acquires standing in a child protection proceeding: (1) the prosecutor appears when requested by the court, (2) the prosecutor appears when requested by the family independence agency to act as a "legal consultant," or (3) when the prosecutor has filed an original petition for termination of parental rights. *In re Jagers*, 224 Mich App 359, 363-364; 568 NW2d 837 (1997), citing MCL 712A.17(4) and (5) and MCL 712A.19b(1); *In re Hill*, 206 Mich App 689, 692; 522 NW2d 914 (1994).

Here, the original and amended petitions were filed by a DHHS worker—not the prosecutor—and there is no indication that the trial court requested the prosecutor's appearance. Thus, it appears the prosecutor's only basis for standing is if DHHS had requested the prosecutor's representation as a "legal consultant." On appeal, the prosecutor has unequivocally denied representing DHHS "as a client." Instead, the prosecutor asserted that it appears at the child protective proceedings only "as a legal consultant pursuant to MCR 3.914."

MCR 3.914(C)(1) states: "On request of the Michigan Family Independence Agency or of an agent under contract with the agency, the prosecuting attorney shall serve as a *legal consultant* to the agency or agent at all stages of a child protective proceeding." With that said, "the agency may retain legal representation of its choice when the prosecuting attorney does not *appear on behalf of the agency* or an agent under contract with the agency." MCR 3.914(C)(2) (emphasis added). MCR 3.914 does not define a "legal consultant." However, subsection (C)(2) indicates that a prosecutor appears "on behalf of the agency." This potential issue has surfaced because the prosecutor and DHHS strongly disagree about whether reunification should occur. Considering the prosecutor's express declaration that it is not representing DHHS, the trial court should determine on remand whether the prosecutor has standing to be heard during the remainder of the proceedings.

Vacated and remanded.  We do not retain jurisdiction.


/s/ Thomas C. Cameron
/s/ Jane M. Beckering
/s/ Michael J. Riordan