*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
September 19, 2024

*In re* BASEY, Minors.

No. 369544
Ingham Circuit Court
Family Division
LC No. 22-000391-NA

Before: RICK, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order terminating her parental rights to her two minor children, JB and AB. We affirm.

## I. FACTUAL BACKGROUND

In May 2022, petitioner, the Department of Health and Human Services (DHHS), filed a petition to remove JB and AB from mother's care after they were found wandering alone outside an apartment complex for eight hours. The petition alleged that the children had significant bodily injuries, including bruising, whip marks, lacerations, and old bone fractures, consistent with physical abuse. There was an extensive call history for domestic violence at the family's address. The petition was authorized following a preliminary hearing, and the children were placed in foster care with a relative. The trial court assumed jurisdiction in July 2022 after mother pleaded no contest to the petition allegations. She was ordered to comply with, and benefit from, a case-service plan (CSP). Barriers to reunification included emotional instability, mental-health concerns, inadequate housing, inconsistent employment, lack of parenting skills, criminal history, and unhealthy domestic relationships.

Relevant to this appeal, at a November 2022 review hearing, the children's foster care caseworker testified that mother was doing well in supervised parenting time sessions with the children. Counsel for DHHS indicated that there was an outstanding warrant request for child abuse charges against mother. The trial court concluded that it was not yet comfortable offering unsupervised parenting time and advised the parties that "there's some things that we need to be clear on going forward" as it pertained to the child abuse warrant. Later, at a January 2023 review

-1-

hearing, the foster care caseworker explained that the child-abuse investigation was still incomplete and stated that parenting time would remain supervised. The trial court reminded the caseworker that mother was under no legal obligation to speak to the police about those charges because she had a constitutional right to remain silent.

At a permanency planning hearing held in April 2023, DHHS recommended initiating proceedings to terminate mother's parental rights. The caseworker stated that mother admitted that her boyfriend, SG, was responsible for physically abusing her children, despite previously alleging that she did not know who was responsible for the abuse. The caseworker further stated that mother had lied about where she had been living. Mother gave the caseworker an address for an apartment that turned out to be empty, and the caseworker later determined that mother had been living with SG. The caseworker added that mother was violating a no-contact order by living with SG. She additionally explained that mother would not be given unsupervised parenting time while the child-abuse investigation was ongoing, but acknowledged that mother had a constitutional right not to make potentially self-incriminating statements to the police. The trial court declined to order DHHS to file a supplemental petition for termination at that time. It instead concluded that DHHS had made reasonable reunification efforts, and that mother had made "some progress" with her treatment plan. The court ordered mother to participate in therapy, as recommended by her psychological evaluator, to address domestic violence and parenting issues, and to cease all contact with SG.

At a July 2023 permanency planning hearing, the foster care caseworker reported that the children were doing well in their placement. Mother's parenting time remained supervised. The caseworker reiterated that she did not believe that mother was being honest regarding her relationship with SG. SG had been charged with domestic abuse against mother and was incarcerated. Despite a no-contact order, mother maintained ongoing communication with him. Mother also appeared to be lying about her relationships with other men. The caseworker attested that in June 2023, she went to mother's apartment and saw a man driving away in mother's car. The caseworker observed men's clothing in the apartment during the visit. When confronted, mother denied being in a relationship and offered elaborate stories to explain the inconsistencies with the evidence that a man was living with her. Additionally, mother still did not have a driver's license, but continued to drive. The caseworker asked that the permanency goal be changed from reunification to adoption because of mother's lack of progress with her CSP, especially given her unhealthy relationships with men and the children's need for permanency and safety. The court declined to change the permanency goal and instead gave mother 90 days to make significant progress with her treatment plan.

At an October 2023 review hearing, the trial court concluded that mother was maintaining sobriety and was no longer on probation. However, a home visit revealed that mother had no food and the electricity had been turned off. She still did not have a driver's license and presented no documentation that she had paid outstanding tickets so that her license could be reinstated. Mother continued to drive to and from parenting time while attempting to conceal doing so. She had missed 6 of 14 scheduled therapy sessions. The children's caseworker testified that mother was not benefiting from therapy because she missed sessions repeatedly and continued to lie about her relationships.

The caseworker further testified that mother reported having a job, but was later fired. When confronted about it, mother lied about getting fired. The caseworker explained that parenting time had been scheduled around mother's purportedly busy work schedule, which had apparently not existed. Moreover, mother lied about being in a relationship, as revealed in Facebook posts showing that she was dating a man named MJ. The caseworker stated that she saw mother driving to and from parenting time with her new boyfriend and that it appeared that he had been living with her. Mother told the caseworker that she broke up with MJ in July 2023 because she learned he was on the sex-offender registry, but posts on social media showed that they remained together until at least August 2023.

Regarding mother's involvement in the criminal case against SG, the caseworker testified that mother said that the investigative reports were incorrect. Mother was told numerous times by caseworkers to rectify the incorrect information and to finish her interviews with the police so that claims of child abuse could be settled. The caseworker insinuated that mother's failure to talk to the police constituted a failure to protect her children in the event of future abuse. Additionally, DHHS indicated that unsupervised parenting time should not be permitted because of mother's lack of progress toward rectifying barriers to reunification, her dishonesty about her romantic partners, and her propensity for driving without a license while failing to take steps to get her license reinstated.

In its ruling, the trial court made it clear that mother had a right to remain silent and not speak to the detectives. The court also opined that petitioner's stance that mother must talk with the police was "inappropriate." The court refused to "hold that against her whatsoever." However, for the other reasons presented, including mother's failure to benefit from her CSP over the course of the 17 months that the children had been in placement, the court changed the permanency goal from reunification to adoption. The court thereafter authorized an amended supplemental petition to terminate mother's parental rights. In January 2024, mother's parental rights were terminated under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continued to exist), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent). This appeal followed.

## II. ANALYSIS

Mother argues that the trial court violated her Fifth Amendment rights by declining to grant unsupervised parenting time unless she made a self-incriminating statement to police about a pending child-abuse investigation. We disagree.

An issue is preserved by raising it before the trial court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). In this case, although mother opposed the termination of her parental rights in the proceedings below, she did not allege a violation of her Fifth Amendment right against self-incrimination. Thus, this issue is unpreserved, and our review is for plain error affecting mother's substantial rights. *VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011); *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re Utrera*, 281 Mich App at 8. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected

-3-

the outcome of the proceedings." *Id.* at 9. The asserting party bears the burden of persuasion with respect to prejudice. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 70 (2020).

The Fifth Amendment guarantee that "no person . . . shall be compelled in any criminal case to be a witness against [themself]"[1] applies to any situation in which a criminal prosecution might follow. *In re Blakeman*, 326 Mich App 318, 332-333; 926 NW2d 326 (2018). "The privilege against self-incrimination permits a defendant to refuse to answer official questions in any other proceeding, no matter how formal or informal, if the answer may incriminate him or her in future criminal proceedings." *Id.* at 333. There are "two interrelated requirements for a Fifth Amendment violation: compulsion, i.e., evidence that a person is unable to remain silent unless [they] choose[] to speak in the unfettered exercise of [their] own will, that is grounded on a penalty exacted for a refusal to testify." *Id.* at 334-335 (quotation marks and citations omitted).

Mother argues on appeal that her case is factually similar to *Blakeman*. In that case, the respondent refused to incriminate himself and admit to child abuse, causing the court to order him to remain outside the family home for a prolonged period of time. *Id.* at 325. The respondent was granted only supervised parenting time and was informed by the government that he likely faced the future termination of his parental rights, despite making every effort to adhere to a CSP and work toward reunification with his children. *Id.* at 326, 335-336. At one point, the trial court went so far as to reject DHHS's recommendation that the respondent be reunited with his children because the respondent had not admitted to child abuse. *Id.* at 325.

On appeal, this Court noted that the respondent initially waived his Fifth Amendment right at the adjudication, and provided "nonincriminating" testimony that he did not commit child abuse. *Id.* at 334. The respondent was later forced by the trial court into what this Court characterized as a "Hobbesian" choice, in which he could either 1) admit to child abuse and expose himself to criminal liability, or 2) continue maintaining his innocence and lose his parental rights. *Id.* at 334-335. This Court observed that as a result, the respondent was essentially compelled to admit to child abuse. *Id.* We further explained:

> Even though respondent initially waived his Fifth Amendment right to remain silent, there was a sufficient showing of compulsion at the dispositional review hearing. The compulsion of nonincriminating testimony is not the sort of compulsion contemplated by the Fifth Amendment. The trial court, however, conditioned reunification on an admission of guilt to the child abuse. We see no reason to conclude that there is a lack of compulsion simply because respondent initially waived his Fifth Amendment right, testified at the trial, and was then later compelled to retract his claim of innocence and incriminate himself. Compulsion occurs when a person is unable to remain silent unless he chooses to speak in the unfettered exercise of his own will. As the trial court explained, he had a choice to choose between his liberty interests or his children. Respondent chose the former, but any right to remain silent was no longer unfettered, and there was sufficient

---

[1] See also Const 1963 art 1, § 17.

compulsion "to be a witness against himself." US Const, Am V. [*Blakeman*, 326 Mich App at 335-336 (cleaned up).]

This Court ultimately concluded that the penalty imposed on the respondent for his failure to incriminate himself by admitting to child abuse was a clear violation of his Fifth Amendment rights. *Id*. at 336.

*Blakeman* is factually distinguishable from this case. Throughout the proceedings below, the trial court here safeguarded mother's right against self-incrimination as to any child-abuse allegations, unlike the trial court in *Blakeman*, which doggedly pursued the respondent and pressured him to admit to child abuse long after DHHS recommended reunification. *Id*. at 326, 335-336. During the jurisdictional phase of the proceedings, mother was neither pressured to incriminate herself nor punished for refusing to do so. Mother was additionally allowed to plead no contest specifically to protect her Fifth Amendment right in light of her potential criminal liability related to child abuse. At subsequent hearings, the trial court and caseworkers acknowledged that she was not required to speak to the police or incriminate herself. Further, the court clearly stated on the record that mother had a right to remain silent and that DHHS's insinuation that mother should talk with police investigators was "inappropriate." It refused to hold mother's refusal to talk with police "against her whatsoever."

Mother overlooks that in her case, parenting time remained supervised because of other ongoing issues, not because she refused to incriminate herself in the child-abuse case. In *Blakeman*, the respondent adhered to a CSP and worked to amend any issues that might prevent him from reunification with his children. *Blakeman*, 326 Mich App at 326. DHHS recommended reunification because the respondent no longer posed a safety concern to his children. *Id*. Here, mother failed to adhere to or benefit from her CSP, primarily with regard to mother's unhealthy relationships with men. Mother was repeatedly untruthful about these relationships. At one point, she claimed she was not in a relationship, despite the presence of men's clothing in her apartment. She refused to stay away from SG, who was also implicated in the child-abuse investigation, despite being ordered to do so by the court. She later dated MJ, who was on the sex-offender registry. All of these choices posed a substantial safety risk to the children, and at no point did mother prove that she could be trusted to care for them without supervision. Beyond the concern about mother's interpersonal relationships, DHHS and the court repeatedly asked mother to stop driving without a license and instead get her license reinstated, but she refused. Overall, it is clear from the record that the court's refusal to grant unsupervised parenting time was not predicated on mother's unwillingness to make self-incriminating statements or imposed as a penalty for her failure to do so. Rather, it was predicated on legitimate concerns for the children's safety, and mother's predilection for dishonesty in matters affecting the children. Mother has not brought to light any plain error on the part of the trial court, involving her Fifth Amendment rights or otherwise, let alone an error that seriously affected the fairness, integrity, or public reputation of the proceedings.

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado