*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DRUMHELLER, Minors.

UNPUBLISHED
October 15, 2024
11:55 AM

No. 369836
Newaygo Circuit Court
Family Division
LC No. 23-009856-NA

Before: SWARTZLE, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

Respondent-mother's rights were terminated to her two children, SD and CD, under MCL 712A.19b(3)(b)(*ii*) and (j) after it was determined that the children's stepfather had repeatedly raped SD, and respondent-mother failed to protect the children. We affirm.

## I. BACKGROUND

In September 2021, Children's Protective Services (CPS) received allegations that included respondent-mother and stepfather allowing SD to drink alcohol, respondent-mother and stepfather smoking marijuana in front of the children, and SD watching sexually explicit content on the internet. In June 2022, CPS received allegations that CD had bruises on his chest from stepfather engaging in a "military style" form of punishment, including poking CD, and a rug burn on his knee, allegedly caused by stepfather pulling CD up the stairs.

In January, March, and April 2023, CPS received complaints that stepfather was sexually abusing SD. The March 2023 report indicated that stepfather was in a "sexual relationship" with SD, and that respondent-mother and stepfather were smoking marijuana with SD. The April 2023 report included the allegation that respondent-mother was aware of the abuse and had indicated that, if anyone found out about it, respondent-mother would kill herself and SD. SD did not make any disclosures when interviewed by CPS.

In June 2023, stepfather was arrested due to allegations that he had sexually assaulted SD's 15-year old friend. Respondent-mother bonded stepfather out of jail the same day. Respondent-mother agreed to have SD reside with a cousin, and CD went to live with his and SD's father.

-1-

Later that month, respondent-mother sent to SD a message that read: "Because if everything gets out that I know things I will never get any of the kids back," after which SD wanted to speak with CPS. SD then disclosed to CPS that stepfather had raped her multiple times between July 2022 and October 2022. According to the CPS petition, SD reported that respondent-mother knew about SD's "relationship" with stepfather, participated in the abuse, and told her not to tell anyone about the abuse or about the marijuana and alcohol.

Officers obtained search warrants, and, on stepfather's phone, found at least 91 sexually explicit photos and videos of SD, some of which showed sexual contact between SD and stepfather. On respondent-mother's phone, officers found internet searches from December 2022 for "polygamy, sexual relationship between mother, daughter, and husband, how to have a relationship between mother, daughter, husband, little wife syndrome". The home computer showed searches for "stepfather-stepdaughter porn" and "taking photos of unclothed stepdaughter."

CPS filed a petition seeking removal of SD and CD from respondent-mother and termination of respondent-mother's parental rights. Respondent-mother was also charged with first-degree criminal sexual conduct.

At the beginning of respondent-mother's termination hearing, her retained attorney for her criminal proceedings, Frank Stanley, asserted that respondent-mother would exercise her Fifth Amendment right against self-incrimination in response to petitioner calling her as a witness. Stanley asserted that his practice area did not include termination proceedings and that he would defer to respondent-mother's counsel, Dianne Longoria, in the termination proceedings. Respondent-mother affirmed that it was her desire to exercise her Fifth Amendment rights. Respondent-mother acknowledged that she was represented by Longoria in this case, who voiced no opinion on the Fifth Amendment matter. Later in the trial, however, Longoria requested an adjournment until after the resolution of the criminal case so that respondent-mother could testify because her invoking her right to silence was "not beneficial to her in this case." The trial court denied the request. The trial court explained, however, that if respondent-mother were to change her mind about testifying, the court would adjourn to allow her to speak to Stanley about the matter.

SD testified that stepfather raped her multiple times from July 2022 to October 2022, ranging from one-to-three times a week. SD did not think that respondent-mother knew about the abuse when it began, but she thought that respondent-mother knew by the time SD went back to school. SD testified that stepfather considered the "relationship" to be a "threesome" and that respondent-mother was aware of the abuse before SD went to stay with her cousin, but respondent-mother "thought it was just a relationship." For some of the incidents, respondent-mother was in the room. SD explained, "Sometimes, it would be at the night and we're all—like I'm sleeping in the parents' room, so once [stepfather]'s done with me, he would go to [respondent-mother]." Respondent-mother appeared to be awake during those incidents. During other incidents for which respondent-mother was in the room, respondent-mother "was either grabbing things, changing, or letting [them] know that the food was done." Stepfather also took sexually explicit pictures of SD. SD testified that she slept in respondent-mother's and stepfather's room because stepfather asked or told her to. Stepfather would also rape SD during the day, when mother was at work, and he would have SD stay home from school. SD explained that stepfather did not want to use condoms,

and, although SD did not know if respondent-mother was aware of stepfather wanting SD to start birth control, respondent-mother was the one who took SD to the doctor for birth control.

SD testified further that stepfather had sex with SD's 16-year-old friend, which SD saw occur in the garage. Stepfather and respondent-mother would also provide SD with marijuana and alcohol. SD testified that stepfather had a short fuse and would "yell constantly" or kick them out. Respondent-mother was present, but she could not protect the children from stepfather's temper. Stepfather threw objects at everyone, which would hit them "99 percent of the time, he had pretty good accuracy." Stepfather also pushed CD "quite a bit" and "like[d] to poke him pretty hard." SD did not know if respondent-mother was present for the physical incidents.

SD testified that she would like to try to have a relationship with respondent-mother "eventually but not at the moment." SD wanted respondent-mother to realize what she had done was not okay, and SD felt that respondent-mother had let her down by not protecting her from stepfather. SD wanted her father's wife to adopt her.

Jason Thompson, of CPS, testified that termination was in the children's best interests because respondent-mother knew about, and was present during, stepfather's sexual abuse of SD, and because of criminal activity in the house, including providing alcohol and marijuana to minors. Thompson did not think that, at the time of trial, it would be safe for SD to continue her relationship with respondent-mother, even with stepfather out of the home, because of the "severity of the criminal acts that occurred under [respondent-mother]'s watch" and because respondent-mother bonded stepfather out of jail when he was originally arrested. Thompson had been afraid that respondent-mother would bond stepfather out of jail, so he had "safety planned [the children] out of the home." Thompson did not think that there were any reasonable alternatives to termination.

SD's and CD's father testified that the children were living with him. Respondent-mother had withheld SD and CD from him starting around Father's Day 2022 and lasting for almost a year. Since the children had returned to father, they were "more upbeat, outgoing, excited," and they were "doing really well." SD's and CD's grades had improved, and they saw counselors. SD had a good relationship with father's wife.

Respondent-mother called 11-year-old CD as a witness. CD testified that he loved respondent-mother, and he wanted "to talk to her a little bit sometimes here and there," but he did not feel safe with stepfather and he did not feel like respondent-mother protected him or SD from stepfather. CD knew that SD sometimes slept in the same room with stepfather and respondent-mother. CD additionally testified that stepfather was "abusive" and yelled at CD "all the time." Stepfather also threw things at him. Respondent-mother was there when stepfather yelled at CD, but not when stepfather threw things at him. CD testified that he liked his father and stepmother, and felt safe with them.

The children's maternal grandmother testified that stepfather was the problem, and the children would be safe with respondent-mother. Grandmother was, however, "[m]aybe a little" concerned about respondent-mother's parenting ability after respondent-mother bonded stepfather out of jail. Grandmother had never asked respondent-mother if she had done any of the things for which she was accused of doing with stepfather to SD.

In closing, respondent-mother's counsel renewed her request for an adjournment until the criminal matter was resolved, to allow respondent-mother to testify about her relationship with the children. The trial court again denied the request. The lawyer-guardian ad litem argued in closing that she had explained to both SD and CD what termination meant, and they "both told [her] that they understood [her] explanation and that that is what they wanted."

The trial court issued an opinion terminating respondent-mother's parental rights under MCL 712A.19b(3)(b)(*ii*) and (j) on the basis that respondent-mother had the opportunity to prevent stepfather's abuse of SD, but did not do so, and because there was a reasonable likelihood of SD and CD being abused in the foreseeable future if returned to respondent-mother. The trial court acknowledged father's testimony that the children had returned to his care, that SD's grades had improved and she was engaged in therapy, and that father and his wife had close relationships with both children. Further, the trial court determined that termination was in the children's interests, noting that SD was the victim of the abuse, but "[t]reatment of one child is probative of how a parent may treat other children," and respondent-mother could repeat her failure to protect SD by failing to protect CD. The trial court explained that SD and CD needed to be protected and were at risk of harm if they returned to respondent-mother's home.

Respondent-mother now appeals.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

A respondent in child-protective proceedings has the right to assistance of counsel. *In re Casto*, 344 Mich App 590, 611; 2 NW3d 102 (2022). As with an ineffective-assistance-of-counsel claim in criminal proceedings, a respondent making such a claim here must show "that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). The respondent was prejudiced if, "but for counsel's deficient performance, there is a reasonable probability that the outcome of the respondent's trial would have been different." *In re Casto*, 344 Mich App at 612 (cleaned up). "The effective assistance of counsel is presumed, and a party claiming ineffective assistance bears a heavy burden of proving otherwise." *Id*.

Michigan's constitutional protections against self-incrimination are construed consistently with the Fifth Amendment to the United States Constitution. *People v Geno*, 261 Mich App 624, 628; 683 NW2d 687 (2004). See US Const, Am V; Const 1963, art 1, § 17. This privilege against self-incrimination can be claimed in any proceeding. *In re Blakeman*, 326 Mich App 318, 332; 926 NW2d 326 (2018). When a party fails to establish that the outcome might have been different had he or she testified, it cannot be said that the party received ineffective assistance of counsel about a decision not to testify. See *People v Spaulding*, 332 Mich App 638, 657-658; 957 NW2d 843 (2020).

Although Stanley spoke at the termination proceedings to invoke respondent-mother's right not to testify, Longoria did not make any specific statement in the record about the matter, and the record does not establish whether Longoria advised respondent-mother whether or not to

invoke the right. Longoria did, however, request that the trial court adjourn the child-protective proceedings until the conclusion of the criminal matter, indicating that respondent-mother could then testify about best interests. Respondent-mother argues on appeal that she could have testified about "a number of factors including best interests. . . without directly addressing anything concerning the criminal case."

Respondent-mother does not, however, explain how she could have testified about her parenting without being exposed to cross-examination about her neglect or abuse of SD, which related to her criminal charges. See MRE 611(c).[1] Nor has she shown what testimony she could have provided that would have changed the trial court's determinations about statutory grounds and best interests. The record was clear that SD and CD cared about respondent-mother, but there was substantial evidence in the record that stepfather repeatedly raped SD and that respondent-mother failed to protect SD from this, and even encouraged SD not to report it. Respondent-mother also bonded stepfather out of jail, despite knowing about the allegations, and had incriminating searches on her phone. Respondent-mother has not shown that she could credibly dispute that information. Further, the trial court had indicated that it would adjourn to allow respondent-mother to contact Stanley had she changed her mind about testifying, and she never did so.

Respondent has not, therefore, shown that Stanley's advice to her, or any advice from her attorney in this case related to the decision, was objectively unreasonable. See *In re Martin*, 316 Mich App at 85. Likewise, respondent-mother has not shown a reasonable likelihood that the proceedings would have been different had she testified. See *In re Casto*, 344 Mich App at 612. Therefore, respondent-mother was not denied the effective assistance of counsel.

## B. STATUTORY GROUNDS

Next, respondent-mother argues that the trial court erred by finding that statutory grounds supported the termination of her rights. We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been established. *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020). Clear error exists when this Court is left with a definite and firm conviction that a mistake has been made. *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003).

The trial court found that the statutory bases for terminating respondent-mother's parental rights were satisfied under MCL 712A.19b(3)(b)(*ii*) and (j). MCL 712A.19b(3)(b)(*ii*) provides for termination of parental rights if the child, or a child's sibling, has suffered sexual abuse and "[t]he parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." MCL 712A.19b(3)(j) provides for termination when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent."

---

[1] The wording of this rule was slightly amended, effective after respondent-mother's trial. The substance of the rule, permitting cross-examination but allowing the trial court to limit it to matters testified about on direct examination, remains consistent.

The record clearly establishes that stepfather repeatedly sexually assaulted SD, with respondent-mother's knowledge and without respondent-mother taking any steps to prevent the abuse. Respondent-mother even encouraged SD not to report stepfather. A search of respondent-mother's phone showed that she had searched for information about "polygamy, sexual relationship between mother, daughter, and husband, how to have a relationship between mother, daughter, husband, little wife syndrome".

Further, both SD and CD established that stepfather threw objects at them when angry. Each child also testified that respondent-mother had not protected them from stepfather. Respondent-mother also prevented the children from visiting their father, showing that she was willing to take steps to protect herself or stepfather at the expense of her children.

On the basis of respondent-mother's complacency in the abuse, attempted concealment of it, and failure to take any steps to stop it, the trial court did not err when it found that there was a reasonable likelihood that SD and CD would suffer harm if returned to respondent-mother's home. There was not just one single event in which the children were harmed. Instead, respondent-mother repeatedly, over at least months, made choices that endangered her children and show a likelihood of harm to them were they returned to her care. Even if respondent-mother had not known about the allegations against stepfather until the reports to CPS beginning in January 2023, because of the subsequent CPS investigations, she was aware of the concerns by the time she bonded stepfather out of jail in June 2023 after he was arrested for sexual conduct against a minor. The trial court did not err by finding that statutory grounds existed to support termination.

## C. BEST INTERESTS

Finally, respondent-mother argues that the trial court erred when it found that termination of her rights was in the children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts* 297 Mich App 35, 40; 823 NW2d 144 (2012). We review for clear error a trial court's determination that, by a preponderance of the evidence, termination was in a child's best interests. *In re Mota*, 334 Mich App at 320.

A court must focus on the best interests of the child, rather than the parent's interests. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). The court also has the duty to decide individually each child's best interests. *In re Olive/Metts*, 297 Mich App at 42. Relevant considerations in a best-interest determination include the bond between the child and parent; parenting ability; and the child's need for permanency, stability, and finality. *Id*. at 41-42. "Brief, definite, and pertinent findings and conclusions on contested matters are sufficient." MCR 3.977(I)(1).[2] "Placement with a relative weighs against termination, but that fact is not dispositive given that a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Atchley*, 341 Mich App 332, 347; 990 NW2d 685 (2022) (cleaned up).

---

[2] MCR 3.977 was amended, effective October 1, 2024. This provision, however, is identical to the previous version that was in effect at the time of respondent-mother's termination proceedings.

The trial court's best-interest findings highlighted respondent-mother's failure to protect SD from stepfather's sexual abuse, and considered anticipatory neglect as favoring termination. See *In re LaFrance Minors*, 306 Mich App 713, 730; 858 NW2d 143 (2014). Although respondent-mother argues on appeal that there was no evidence that she abused or neglected SD or CD and that "[e]ven to say that [respondent-mother] allowed another husband to sexual[ly] assault her daughter, that does not equate to a son." Respondent-mother's ongoing actions, however, support the trial court's finding that CD, as well as SD, would be at risk of harm if returned to respondent-mother's care. Respondent-mother's failure to protect SD from stepfather was the most egregious accusation against her, but the record also shows that respondent-mother encouraged SD to cover up the assaults, kept the children from their father throughout the abuse, provided SD with substances, and was aware of stepfather's temper and at least verbal aggression toward the children. CD testified regarding stepfather's physical and verbal abuse toward him that left him physically injured and that respondent-mother did not protect him from stepfather. Respondent-mother's pattern of activity establishes a likelihood that she would fail to protect the children in the future, whether from sexual abuse or a different harm. The court properly considered each child's best interests. See *In re Olive/Metts*, 297 Mich App at 42.

Respondent argues that the trial court did not consider the impact on the children's relationship with their maternal grandparents, noting that grandmother was not concerned now that stepfather was out of the picture. Grandmother also admitted, however, that she had not asked respondent-mother if she had engaged in the conduct of which she was accused. Further, grandmother had expressed concern about respondent-mother bonding stepfather out of jail. This testimony did not persuasively establish that respondent-mother could or would protect her children. As with statutory grounds, respondent-mother's ongoing choices in this case show a likelihood that she would make unsafe choices for her children in the future.

The court's decision also properly considered the children's placement with their father. See *In re Atchley*, 341 Mich App at 347. Of note, MCL 712A.13a(1)(j) was only amended in October 2022 to include a parent as a "relative" for purposes of the child-protective proceedings. Prior caselaw indicated that a court was not required to consider placement with a biological parent when determining best interests. See *In re Schadler*, 315 Mich App 406, 413; 890 NW2d 676 (2016). Here, however, the court considered the children's placement with their father in its findings, specifically noting father's testimony about how the children were doing in his home. The children's testimony also indicated that they felt safe and were doing well living with their father and stepmother, and SD testified that she wanted her stepmother to adopt her. Therefore, the trial court did not err by finding that termination was in SD's and CD's best interests.

Affirmed.

/s/ Brock A. Swartzle
/s/ James Robert Redford
/s/ Kathleen A. Feeney

-7-